**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,

               Plaintiff,

    *v.*

ELISABETH KIMMEL,

               Defendant.

Case No. 1:19-cr-10080-NMG-13

***Leave to file excess pages and partially under seal granted on May 26, 2021 (ECF No. 1869)***

**MEMORANDUM IN SUPPORT OF DEFENDANT ELISABETH KIMMEL'S MOTION TO DISMISS OR FOR OTHER RELIEF PURSUANT TO FED R. CRIM. P. 12(b)(3)(A) <u>BASED ON CONSTITUTIONAL VIOLATIONS</u>**

Redacted Document

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

BACKGROUND ............................................................................................................2

I.      Mrs. Kimmel's Pre-Existing Conditions...................................................................2

II.     Mrs. Kimmel's Arrest and Resulting Hospitalization................................................3

III.    Mrs. Kimmel's Health Condition Post-Arrest ..........................................................9

ARGUMENT ..............................................................................................................10

I.      Mrs. Kimmel's Arrest Was an Unreasonable Seizure in Violation of the Fourth
        Amendment to the U.S. Constitution.......................................................................11

II.     The Government Violated Mrs. Kimmel's Due Process Rights When It Denied
        Her Access to Medical Care During Her Arrest ......................................................16

        A.      The Objective Standard for a Substantive Due Process Claim............................16

        B.      The Unreasonable Actions of the Arresting Agents Denied Mrs. Kimmel
                Medical Care and Violated Her Constitutional Rights ..........................................19

III.    Mrs. Kimmel's Cardiac Infirmities Exacerbated by Her Unreasonable Arrest Will
        Deprive Mrs. Kimmel of Her Fifth and Sixth Amendment Rights at Any Trial .............21

        A.      Mrs. Kimmel Is Now in a Riskier Cardiovascular State Because of the
                Government's Actions Than When She Was Arrested............................................21

        B.      The Government's Conduct Infringes Mrs. Kimmel's Fundamental
                Constitutional Right to Testify in Her Own Defense..............................................24

IV.     Dismissal of the Charges Against Mrs. Kimmel Is the Only Appropriate Remedy .........26

        A.      These Constitutional Infringements Require a Remedy ......................................26

        B.      Dismissal Is the Only Effective—and the Only Appropriate—Remedy...............27

CONCLUSION............................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alexander v. City & Cty. of S.F.*,
    29 F.3d 1355 (9th Cir. 1994) .................................................................12

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011).............................................................................14

*Battista v. Clarke*,
    645 F.3d 449 (1st Cir. 2011) .................................................................19

*Berger v. United States*,
    295 U.S. 78 (1935).............................................................................10

*Brady v. Maryland*,
    373 U.S. 83 (1963).........................................................................10, 11

*California v. Trombetta*,
    467 U.S. 479 (1984)............................................................................25

*City of Revere v. Mass. Gen. Hosp.*,
    463 U.S. 239 (1983)............................................................................16

*Colbruno v. Kessler*,
    928 F.3d 1156 (10th Cir. 2019) ............................................................17

*Coscia v. Town of Pembroke*,
    659 F.3d 37 (1st Cir. 2011)..................................................................17

*Couchon v. Cousins*,
    2018 U.S. Dist. LEXIS 149109 (D. Mass. Aug. 31, 2018)........................18

*Cty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998)............................................................................15

*Dalia v. United States*,
    441 U.S. 238 (1979)............................................................................12

*Darnell v. Pineiro*,
    849 F.3d 17 (2d Cir. 2017)........................................................16, 17, 18

*Doty v. Sewall*,
    908 F.2d 1053 (1st Cir. 1990)...............................................................27

*Dunn v. Denk*,
    54 F.3d 248 (5th Cir. 1995) ....................................................................................27

*Estate of Smith v. Marasco*,
    430 F.3d 140 (3d Cir. 2005)..................................................................................12

*Figueroa-Torres v. Toleda-Davila*,
    232 F.3d 270 (1st Cir. 2000) ................................................................................27

*Gaudreault v. Municipality of Salem*,
    923 F.2d 203 (1st Cir. 1990) ....................................................................16, 17, 20

*Gomes v. US Dep't of Homeland Sec.*,
    460 F. Supp. 3d 132 (D.N.H. 2020) ....................................................................18

*Gordon v. Cnty. of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ........................................................................17, 18

*Graham v. Connor*,
    490 U.S. 386 (1989).....................................................................................11, 15, 16

*Gray v. Cummings*,
    917 F.3d 1 (1st Cir. 2019) ....................................................................................11

*Green v. United States*,
    365 U.S. 301 (1961)..............................................................................................30

*Holland ex rel. Overdorff v. Harrington*,
    268 F.3d 1179 (10th Cir. 2001) ..................................................................12, 13, 14

*Jenkins v. Bergeron*,
    67 F. Supp. 3d 472 (D. Mass. 2014) (Gorton, J.), *aff'd*, 824 F.3d 148 (1st
    2016) ......................................................................................................................26

*Jones v. Barnes*,
    463 U.S. 745 (1983)..............................................................................................27

*Kingsley v. Hendrickson*,
    576 U.S. 389 (2015).....................................................................................17, 18, 20

*Luce v. United States*,
    469 U.S. 38 (1984)................................................................................................28

*Malinski v. New York*,
    324 U.S. 401 (1945) (Frankfurter, J., concurring) ..............................................16

*Marbury v. Madison*,
    5 U.S. 137 (1803)..................................................................................................26

*McCoy v. Louisiana*,
    138 S. Ct. 1500 (2018) ................................................................................27, 28

*Medeiros v. Martin*,
    458 F. Supp. 3d 122 (D.R.I. 2020) ........................................................................18

*Meredith v. Erath*,
    342 F.3d 1057 (9th Cir. 2003) ............................................................................13

*Miranda v. Cty. of Lake*,
    900 F.3d 335 (7th Cir. 2018) ........................................................................17, 18

*Miranda-Rivera v. Toledo-Dávila*,
    813 F.3d 64 (1st Cir. 2016) ......................................................................16, 18, 19

*Moreau v. Gerardi*,
    2010 U.S. Dist. LEXIS 124613 (D. Mass. Nov. 24, 2010) .....................................16

*Owens v. United States*,
    483 F.3d 48 (1st Cir. 2007) .........................................................................24, 28

*Parker v. Gerrish*,
    547 F.3d 1 (1st Cir. 2008) ...................................................................................12

*Richmond v. Huq*,
    885 F.3d 928 (6th Cir. 2018) ..............................................................................17

*Rock v. Arkansas*,
    483 U.S. 44 (1987) .........................................................................24, 25, 28, 30

*Salcedo v. King*,
    2018 U.S. Dist. LEXIS 61205 (D. Me. Apr. 11, 2018) ..........................................18

*Savino v. Souza*,
    459 F. Supp. 3d 317 (D. Mass. 2020) ..................................................................18

*Stamps v. Town of Framingham*,
    813 F.3d 27 (1st Cir. 2016) ...........................................................................13, 14

*Stein v. KPMG, LLP*,
    486 F.3d 753 (2d Cir. 2007) ................................................................................26

*Terebesi v. Torreso*,
    764 F.3d 217 (2d Cir. 2014) ...........................................................................12, 14

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006) ...........................................................................................28

iv

*United States v. Morrison*,
    449 U.S. 361 (1981)................................................................................26

*United States v. Stein (Stein I)*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006)............................................25, 26

*United States v. Straub*,
    538 F.3d 1147 (9th Cir. 2008) ..............................................................29

*Weaver v. Massachusetts*,
    137 S. Ct. 1899 (2017)......................................................................27, 28

*Webb v. Texas*,
    409 U.S. 95 (1972)..................................................................................25

*Zingg v. Groblewski*,
    907 F.3d 630 (1st Cir. 2018) ................................................................18

**State Cases**

*Commonwealth v. Fontaine*,
    402 Mass. 491 (1988) ............................................................................29

*Commonwealth v. Teixeira*,
    76 Mass. App. Ct. 101 (2010)................................................................25

In the pre-dawn hours of March 12, 2019, a squad of federal agents assembled outside Elisabeth Kimmel's quiet family home. Heavily armed and wearing tactical gear, the agents scaled the fence and advanced on the darkened house, where Mrs. Kimmel, her husband, and two of her children were asleep. Mrs. Kimmel's husband awoke to the sound of loud banging and yelling and, thinking a home invasion was taking place, instructed his daughter to call the police.

Needless to say, this show of brute force succeeded in overwhelming Mrs. Kimmel, a 54-year old, 96-pound woman with a long history of coronary problems and no criminal history. In fact, it so overwhelmed her that she began to suffer chest pains, and soon experienced a serious coronary event that reduced her heart's pumping capacity to a mere 15 percent. She became so ill that, after holding her for hours in a vehicle before dropping her off for booking, the arresting agents were called back to take her to an emergency room. Mrs. Kimmel spent the next five days in the hospital, three of them in a cardiac intensive care unit, recovering from a dangerous cardiac incident—known as Takotsubo cardiomyopathy—brought on by her arrest.

The government's tactics didn't just cause Mrs. Kimmel immediate distress; they exacerbated her existing infirmities and increased her risk of having another serious cardiac event, such that she now faces a painful dilemma: testify in her own defense at trial and risk suffering another episode that could at best hospitalize her again, and at worst kill her; or decline to take the stand to protect her health and risk conviction by a jury that never gets to hear her side of the story. Relief is required here because the government's own unconstitutional arrest tactics have put Mrs. Kimmel in this untenable situation.

The government's behavior had a snowball effect on Mrs. Kimmel's constitutional rights. First, its tactics violated her Fourth Amendment protection against unreasonable searches and seizures. In the immediate aftermath of her arrest, its disregard of her urgent and obvious medical

needs reflected callous indifference, inflicting cruel and unusual punishment on her and depriving her of due process. Now, because of the government's actions and their impact on her health, she can avail herself of her trial rights under the Fifth and Sixth Amendments only by putting herself at mortal risk. Under these circumstances, subjecting Mrs. Kimmel to a trial would be fundamentally unfair. The only appropriate remedy is dismissal of the Indictment.

## BACKGROUND

### I.    Mrs. Kimmel's Pre-Existing Conditions

Mrs. Kimmel has a history of cardiac and ███████████ diseases. In 2007, she learned that a ████████████████████████████████. Doctors evaluated her for both thoracic aortic and brain aneurysms, ████████████████████████. Declaration of Elisabeth Kimmel ("Kimmel Decl.") ¶ 4 (attached to the Declaration of Eóin P. Beirne ("Beirne Decl.") as Exhibit 1); Declaration of Dr. ████████ ("Physician Decl.") ¶ 8 (Beirne Decl. Ex. 2); Declaration of Dr. Anthony David Litvak ("Litvak Decl.") ¶ 15 (Beirne Decl. Ex. 3).

Mrs. Kimmel learned that she had a weakened area in the thoracic ascending aorta—the major vessel that pumps blood to the body. Kimmel Decl. ¶ 4; Physician Decl. ¶ 8: Litvak Decl. ¶ 15. When the aorta is weak, the blood pushing against the aorta's wall can cause it to bulge. This is known as an aneurysm. Aneurysms are rare, and while some can be treated with medications, surgical intervention is required for larger aneurysms or for individuals ████████████████ ████████████████████████. Beirne Decl. Ex. 4. Smaller patients, like Mrs. Kimmel, are also more likely to need surgical intervention. *Id.*; *see* Kimmel Decl. ¶ 5.

In 2008, Mrs. Kimmel had open heart surgery to repair both her aortic aneurysm and aortic valve. Her surgeon performed a thoracic aortic saccular aneurysmectomy and placement of a graft, and a valve-sparing aortic root replacement known as the David Procedure. Kimmel Decl. ¶ 6;

Physician Decl. ¶ 8; Litvak Decl. ¶ 16. This is a challenging procedure that aims to repair an aneurysm while preserving the existing aortic valve. Kimmel Decl. ¶ 6.

In December 2017—nine years after the surgery, and less than two years before her arrest—Mrs. Kimmel experienced chest pain in connection with business stress and sought medical attention. Although she was diagnosed at the time with a muscle tear or stress-induced chest pain, the symptoms she experienced were consistent with a cardiac event known as Takotsubo cardiomyopathy (or "TC"), and it is possible that she suffered such an event, as TC is rare and often not properly diagnosed. Beirne Decl. Ex. 5; Kimmel Decl. ¶ 8.

Mrs. Kimmel also has a history of aortic regurgitation, or a leaky aortic valve. Physician Decl. ¶ 8; Litvak Decl. ¶ 17. This is a complication of her aortic valve repair, and can persist or worsen over time. Beirne Decl. Ex. 6; Kimmel Decl. ¶ 7. Aortic regurgitation is a heart valve disease. Beirne Decl. Ex. 7. It is caused by the aortic valve not closing as tightly as it should, allowing blood to flow from the aorta to the left ventricle. *Id.* Post-surgery, her aortic regurgitation was classified as "mild to moderate." A cardiologist classified the regurgitation as worsening, though still "moderate," just a few months before her arrest. Kimmel Decl. ¶ 9; Litvak Decl. ¶ 17.

In addition to her cardiac conditions, Mrs. Kimmel has a history of ███████████ ████████████████████████████████ Kimmel Decl. ¶¶ 10-12; Beirne Decl. Ex. 8. ███ ████████████████████ *Id.*; Beirne Decl. Ex. 9. In the month before her arrest, while under care for a fracture in her right foot, she experienced increasing tenderness in her left foot; while in custody, her left foot was diagnosed as broken. *See* Kimmel Decl. ¶¶ 12, 24.

## II.   Mrs. Kimmel's Arrest and Resulting Hospitalization

On March 12, 2019, the government unsealed documents charging some 50 people with crimes connected to its "Varsity Blues" investigation. As the government noted when it asked the Court to unseal the charging papers, prosecutors had treated the defendants differently, allowing

some to self-surrender and arresting others. *See* ECF No. 6 at 1 (government requesting that Complaint be unsealed because "the defendants have been arrested or notified of the charges"). Some defendants were seized by especially ostentatious shows of force. Mrs. Kimmel was one of the unlucky ones. The FBI agents who descended on her home seemed more prepared for a mass raid on a gang redoubt than for a single arrest at a family home in California.

The government has never explained this decision. There appears to be no rhyme or reason for its widely disparate treatment of those it deems culpable. It certainly had no reason to single out Mrs. Kimmel. She had no criminal record nor any history of violence. She was and is not a flight risk, given her extensive community and family ties. And she was, according to the unsealed Complaint, charged with a single count of conspiring to commit mail and wire fraud, a non-violent felony that allegedly occurred and was complete years before her arrest. ECF No. 3 at 41-42.

Nevertheless, on the morning of March 12, the government sent 14 armed federal agents from multiple law enforcement agencies to Mrs. Kimmel's home. Kimmel Decl. ¶ 13. At approximately 6:00 a.m., in pitch-black darkness, these agents scaled the fence surrounding the perimeter of the residence and swarmed the house. *Id.* ¶ 14. At 6:04 a.m., Mrs. Kimmel and her husband awoke to loud banging and yelling outside. *Id.* ¶ 13. Mr. Kimmel found a large team of agents assembled by the front door, guns drawn, in full tactical gear, a picture of intimidation captured by their home security system:





Fearing a home invasion, Mr. Kimmel told his daughter to call the police. *Id.* ¶ 15. Following the agents' instructions, Mr. Kimmel cautiously opened the door to reveal the armed brigade waiting outside, who informed him that they had an arrest warrant for his wife. *Id.* Mr. Kimmel was detained while the agents continued to yell for Mrs. Kimmel and her two children to come to the front door. They complied. *Id.* At the request of the 911 operator (who was on the line with Mrs. Kimmel's daughter), the agents confirmed that they had notified the San Diego Police Department of their predawn raid 5-10 minutes before advancing on the residence. *Id.* ¶ 16.

At around 6:10 a.m., the agents escorted the family into the living room and explained that they were there to arrest Mrs. Kimmel. Kimmel Decl. ¶ 17. Mrs. Kimmel immediately told the agents that her heart was racing out of control, while Mr. Kimmel informed them of her prior heart surgery. *Id.* She was having trouble breathing and was in obvious distress. *Id.* When Mrs. Kimmel told the agents that her heart was racing, the agents asked if they should call an ambulance, but the Kimmels declined because Mrs. Kimmel's symptoms had not fully manifested themselves, and she chalked them up to shock. *Id.* This was the only time during the course of Mrs. Kimmel's arrest that an agent offered to call an ambulance. *Id.* After further discussion, one agent accompanied Mrs. Kimmel upstairs to change her clothes. Agents then led Mrs. Kimmel out of the house and handcuffed her. *Id.* ¶ 18. At one point, Mrs. Kimmel asked the agents why they were arresting her with such force. *Id.* ¶ 19. They replied that it was "standard protocol." *See id.*

At 6:42 a.m., two agents transported Mrs. Kimmel, still handcuffed with her hands behind her back, to the Metropolitan Correctional Center ("MCC") in San Diego for booking and an initial appearance. Kimmel Decl. ¶ 20. While waiting in the vehicle outside the MCC, Mrs. Kimmel reported feeling nauseous, thirsty, and lightheaded. *Id.* She remained handcuffed and was denied water and use of a bathroom. *Id.* The agents, seemingly more concerned about their vehicle than their prisoner's well-being, instructed Mrs. Kimmel that if she was going to vomit, she should keep her head out of the window because their car had recently been cleaned. *Id.*

More than an hour passed, during which the agents made no effort to obtain or provide care for their detainee. Finally, at approximately 8:20 a.m., the agents escorted Mrs. Kimmel into the MCC. Kimmel Decl. ¶ 21. The MCC staff, however, declined to process Mrs. Kimmel, due to her obvious medical distress. *Id.* They were not doctors, but they immediately recognized the gravity of Mrs. Kimmel's condition. The MCC staff directed the agents to take her to the emergency room because of concerns about both her heart—including tightness in her chest—and her feet. *Id.*; Litvak Decl. ¶ 18. On the way to the emergency room, the agents called Mr. Kimmel, but when he pleaded with them to allow his wife to return home and self-surrender after receiving medical attention, the agents refused. Kimmel Decl. ¶ 22. The agents also denied Mr. Kimmel's request to see Mrs. Kimmel. *Id.* Shortly before 9:30 a.m.—now more than *three hours* after Mrs. Kimmel had first told the arresting agents that her heart was racing out of control, and Mr. Kimmel had told them about her history of heart disease—Mrs. Kimmel finally arrived at the emergency room of Alvarado Hospital. Kimmel Decl. ¶ 23; Litvak Decl. ¶¶ 18-19. By 11:00 a.m., the hospital staff advised the agents that Mrs. Kimmel's initial test results were dire. Kimmel Decl. ¶ 24; *see* Litvak Decl. ¶ 19. Only after being told that Mrs. Kimmel was a "very sick woman" who needed to make some serious medical decisions did the agents, for the first time, call Mr. Kimmel and allow him

to join Mrs. Kimmel at the hospital. *See* Kimmel Decl. ¶ 25. When Mr. Kimmel arrived, he found Mrs. Kimmel connected to tubes and wires, but still guarded by two FBI agents. *Id.*

Mrs. Kimmel was examined by a cardiologist, who noted that she was in perilous shape and strongly recommended that she proceed with an angiogram for her heart. Kimmel Decl. ¶ 26. After conferring with her husband and the cardiologist who has been treating her since her heart valve surgery, Mrs. Kimmel agreed to this invasive procedure. *Id.* While the hospital staff at Alvarado prepared Mrs. Kimmel for the angiogram, the prosecutors finally spoke to her attorney and—perhaps convinced that Mrs. Kimmel was no longer a "flight risk," or just concerned that their "shock and awe" tactics had backfired and become an embarrassment—agreed to release Mrs. Kimmel from FBI custody and to let her voluntarily appear for arraignment once her health improved. *Id.* ¶ 27. When the FBI agents finally departed around 2:00 p.m., one of them belatedly expressed remorse, stating, "I'm sorry we caused all of this." *Id.*

Meanwhile, Mrs. Kimmel's condition continued to deteriorate. Given the compromised status of her heart, attempts to perform an angiogram were futile: her blood pressure dropped so precipitously the procedure had to be aborted. Kimmel Decl. ¶ 28; Litvak Decl. ¶¶ 19-20, 22; Physician Decl. ¶ 9. Other, less invasive tests revealed that Mrs. Kimmel's heart was barely functioning. Litvak Decl. ¶¶ 19-23. The treating physician explained that Mrs. Kimmel was a very sick woman with a very leaky heart valve. Kimmel Decl. ¶¶ 25, 28; *see* Litvak Decl. ¶¶ 19-23. She was initially diagnosed with a non-ST elevation myocardial infarction (NSTEMI), a type of heart attack, and her treating physician suspected she suffered from stress-induced TC, with cardiogenic shock and severe impairment of her left ventricular function. Kimmel Decl. ¶ 28; Litvak Decl. ¶¶ 19-23. Cardiogenic shock is a rare, severe, potentially fatal condition in which the heart is unable to pump enough blood for the body. Beirne Decl. Ex. 10; *see* Litvak Decl. ¶¶ 13, 22, 30;

Physician Decl. ¶ 9. Only a small percentage of patients with TC develop cardiogenic shock, which greatly increases the risk of death. Litvak Decl. ¶¶ 13, 30.[1]

By this time, Mrs. Kimmel's heart was pumping at only 10-15% of capacity, a level severely below normal and indicative of serious heart failure. *See* Litvak Decl. ¶¶ 17, 20. The doctors at Alvarado Hospital determined that Mrs. Kimmel required specialized treatment, and advised the family that *if* and when they could stabilize her, they would transfer her to the Cardiac ICU at Scripps Prebys Cardiovascular Institute. Kimmel Decl. ¶¶ 29-30; Litvak Decl. ¶ 23.

After several more anxious hours in the ICU at Alvarado, late in the day of her arrest, Mrs. Kimmel finally stabilized enough that she could be transported, via critical care ambulance, to the Cardiac ICU at Scripps. Kimmel Decl. ¶ 30; Litvak Decl. ¶ 24. There, she had an angiogram and another echocardiogram in the morning of March 13, which confirmed the diagnosis of stress-induced cardiomyopathy (TC) and cardiogenic shock, as well as severe aortic regurgitation. Litvak Decl. ¶ 24; Physician Decl. ¶ 9; Kimmel Decl. ¶ 31. These conditions had caused severe damage to Mrs. Kimmel's heart. Litvak Decl. ¶¶ 19, 24-27; Physician Decl. ¶¶ 9, 11. She remained in the Cardiac ICU through late on March 14, having spent three days in intensive care between Alvarado and Scripps. Litvak Decl. ¶ 25; Kimmel Decl. ¶¶ 31-32. After another two days in the hospital, Mrs. Kimmel was finally released on March 16, five days after her arrest. Kimmel Decl. ¶¶ 31-32.

At discharge, the attending physician observed that Mrs. Kimmel "remains ill with moderate risk morbidity or mortality due to a life-threatening condition." Kimmel Decl. ¶ 32; *see* Litvak Decl. ¶ 25.[2] Mrs. Kimmel voluntarily appeared in court in San Diego on March 18, 2019,

---

[1] Beirne Decl. Ex. 11 ("[a]pproximately 10 percent of patients with stress cardiomyopathy develop cardiogenic shock," and among them, "in hospital mortality is almost 10-fold higher compared with those without shock").

[2] Damage to her heart wasn't the only injury she had suffered at the hands of the FBI. In addition to her dangerous, ongoing cardiac condition, Mrs. Kimmel's arrest resulted in a torn rotator cuff caused by the two hours she had spent with her hands shackled, as well as increased pain in her feet, including from a newly diagnosed fracture in her left foot. Kimmel Decl. ¶¶ 12, 23, 24, 33.

where she entered a signature bond and was released. *See* ECF No. 108 at 211-15. She traveled to Boston and appeared in this Court on March 29, where no additional conditions of release were imposed. *See* ECF No. 228. The government's aggressive arrest tactics, in other words, proved to be entirely unnecessary, as anyone with an ounce of common sense could have predicted.

## III.    Mrs. Kimmel's Health Condition Post-Arrest

Mrs. Kimmel suffered extreme cardiac distress—including TC, cardiogenic shock, and exacerbation of her existing leaky aortic valve—as a direct result of the government's unreasonable arrest tactics. Her cardiovascular condition became, and remains, perilous. TC is an "acute heart failure syndrome precipitated by intense emotional stress." Beirne Decl. Ex. 12 at 1040; Litvak Decl. ¶¶ 11-14. It presents almost identically to a heart attack, and is diagnosed using similarly invasive tests. Beirne Decl. Ex. 12 at 1040; Litvak Decl. ¶¶ 21, 24. TC causes "major left ventricular dysfunction and acute heart failure." Beirne Decl. Ex. 12 at 1040. It is "a life-threatening condition with comparable in-hospital adverse outcomes to acute coronary syndrome (ACS)." *Id.* Ex. 13 at 874, 875; *see id.* Ex. 14 at 155-57; *see also* Litvak Decl. ¶¶ 11-14, 27, 30.

Mrs. Kimmel had an especially rare and severe TC episode, accompanied by cardiogenic shock, itself a rare and severe TC complication. Litvak Decl. ¶¶ 12-13, 20-32; Physician Decl. ¶ 9. The mortality rate for TC patients is high, exceeding that of heart attacks. Litvak Decl. ¶ 14. Cardiogenic shock is "a common cause of mortality, and management remains challenging despite advances in therapeutic options." Beirne Decl. Ex. 15 at 1. One study estimated a mortality rate of 17-30% for cardiogenic shock in TC. *Id.* Ex. 16 at 20; *see id.* Ex. 17. It can require aggressive, immediate treatment to avoid fatality. Beirne Decl. Ex. 18 at 694; *see* Litvak Decl. ¶¶ 12-14.

This medical jargon can be summarized in seven simple words: ***Mrs. Kimmel's arrest very nearly killed her.*** In fact, her situation was so dire that the first hospital to treat her was not equipped to deal with the severity of her condition. The staff at Alvarado had to work for hours

merely to stabilize Mrs. Kimmel to the point where she could safely be taken to a hospital with a specialized cardiac ICU. Physician Decl. ¶ 9; Litvak Decl. ¶¶ 23-24.

For the first month after her discharge from the hospital, Mrs. Kimmel, previously a regular swimmer, was instructed to do as little activity as possible. Kimmel Decl. ¶ 33. A month after her release from the hospital, Mrs. Kimmel's aortic leakage, previously characterized as "moderate," was re-classified as "moderate to severe"—meaning that her valve condition had deteriorated since her arrest. *id.* ¶ 34; *see* Litvak Decl. ¶ 25. Worsened aortic regurgitation presents an increased likelihood that Mrs. Kimmel will require another valve surgery. Kimmel Decl. ¶ 34. After the government-induced TC incident, Mrs. Kimmel was also placed on a beta-blocker medication that is often used after a heart attack. *Id.* ¶ 35. She has experienced arrhythmia and intermittent chest pain that requires her to closely monitor and limit her heart rate and any exercise. *Id.* ¶ 36.

## ARGUMENT

The government's overbearing tactics, and the cardiac conditions and complications they caused, violate several fundamental protections afforded to criminal defendants. First, Mrs. Kimmel's arrest was an unreasonable seizure in violation of the Fourth Amendment. Second, her treatment immediately following her arrest, including the agents' deliberate indifference to her dire medical condition, was a deprivation of her substantive due process rights under the Fifth Amendment. Third, the consequences of the arrest and the agents' deliberate indifference—the immediate exacerbation of her cardiac condition and the ongoing risk that she will suffer another extreme cardiac event on the order of TC accompanied by cardiogenic shock—have compromised Mrs. Kimmel's fundamental liberty interest, right to direct her defense, and right to testify on her own behalf under the Fifth and Sixth Amendments.

The interest of the government "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963) ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."). Justice is not done when the government uses military-style force to arrest, on a single charge of non-violent crime, a woman with no criminal record and no history of violence, who presented no demonstrable risk of flight. It is not done when the arresting agents ignore obvious signs of severe physical distress and delay for hours the provision of critical, life-saving medical intervention. And justice certainly cannot be done by forcing to trial a defendant who, as a direct consequence of the government's ham-fisted tactics, is handicapped in her ability to participate safely in her defense or to testify on her own behalf without subjecting herself to mortal risk. The remedy must fit the wrong, and here the only fitting remedy is to dismiss the Indictment.

## I.  Mrs. Kimmel's Arrest Was an Unreasonable Seizure in Violation of the Fourth Amendment to the U.S. Constitution.

The use of excessive force to make an arrest violates the Fourth Amendment's prohibition of "unreasonable … seizures" of the person. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The test is objective: a violation occurs if "the [perpetrator] employed force that was unreasonable under all the circumstances." *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019). Several factors are relevant to the analysis, including: "the severity of the crime, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* The inquiry must not be generalized, because the reasonableness analysis "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.

Under any conception of reasonableness, the government's actions violated Mrs. Kimmel's Fourth Amendment rights. Indeed, the arrest strategy was unreasonable from its conception: there

is no defensible reason for the government to have elected to proceed with a military-style assault on Mrs. Kimmel's home for a non-violent offense based on novel legal theories.

This alone amounted to a Fourth Amendment violation. "The decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001). Thus, the decision to use such an overwhelming degree of force violates the Fourth Amendment when "the importance of the governmental interests used to justify the intrusion" are outweighed by the "nature and quality of the intrusion on the individual's Fourth Amendment interests." *Id.*; *see Estate of Smith v. Marasco*, 430 F.3d 140, 149 (3d Cir. 2005) ("[A] decision to employ a SWAT-type team can constitute excessive force if it is not 'objectively reasonable' to do so in light of 'the totality of the circumstances.'"); *see also Dalia v. United States*, 441 U.S. 238, 258 (1979) ("[T]he manner in which a warrant is executed is subject to later judicial review as to its reasonableness."); *Terebesi v. Torreso*, 764 F.3d 217, 233 (2d Cir. 2014) ("[O]fficers who authorize or direct the use of force in effecting a search or seizure must comply with the Fourth Amendment in doing so."); *Alexander v. City & Cty. of S.F.*, 29 F.3d 1355, 1366 (9th Cir. 1994) (applying Fourth Amendment to claim that deployment of SWAT rendered search unreasonable).

The circumstances of Mrs. Kimmel's arrest presented a complete lack of justification for the decision to employ paramilitary tactics to arrest a defendant with no prior arrests or history of any violence who is charged with a non-violent crime. She had been charged with a single count of mail fraud. *See, e.g.*, *Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) ("the seriousness of the offense [factor] weighs in favor of [the defendant]" when the offense charged "does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged

in an offense like robbery or assault"); *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (government used excessive force where individual was forcibly detained during investigation of nonviolent, income tax-related crimes). The Complaint on which Mrs. Kimmel was arrested alleged no ongoing "criminal" activity of any sort. Mrs. Kimmel's alleged involvement in the putative mail fraud scheme indisputably ended with the college admissions of two of her children, the latter in March 2018, a full year before her arrest. *See* ECF No. 3 ¶ 371.

The government also could not articulate, and has not articulated, any concern about spoliation of evidence. All of the evidence was in the hands of a cooperating witness, Rick Singer, and thus available to the government before March 2019; accordingly, the arresting officers held a warrant only for Mrs. Kimmel's arrest, not for a search of her residence. There was, finally, a negligible risk of flight given Mrs. Kimmel's strong community and family ties and lack of foreign residence (not to mention her medical history and need for continuity of expert care). Whether viewed collectively or individually, not a single objective factor supported the decision to send an armed squadron to the Kimmel residence. The decision to use an inherently "overwhelming" show of force thus violated Mrs. Kimmel's Fourth Amendment rights.

The agents' conduct during the raid similarly transgressed constitutional boundaries. The agents came in brandishing weapons, as seen in the still images above and the video footage of Mrs. Kimmel's arrest accessible via Beirne Decl. Ex. 30. Where, as here, there were no grounds for doing so, such conduct alone may violate the Fourth Amendment. "The display of weapons … inescapably involves the immediate threat of deadly force." *Holland*, 268 F.3d at 1192. Thus, "pointing a firearm at a person in a manner that creates a risk of harm incommensurate with any police necessity can amount to a Fourth Amendment violation." *Stamps v. Town of Framingham*,

813 F.3d 27, 42 (1st Cir. 2016); *see Terebesi*, 764 F.3d at 240 ("a search may be unreasonable under the Fourth Amendment even if officers do no more than threaten … with firearms").

Such risky tactics might have been justified only if they were "predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." *Holland*, 268 F.3d at 1192. No such risk existed here. The government had no reason to send heavily-armed agents to Mrs. Kimmel's property, with no notice and guns drawn. The agents' subjective intent, whatever it may have been, is irrelevant. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736-37 (2011). The task at hand—arresting an alleged first-time offender for a completed, nonviolent offense—did not call for the show of force the government employed in this case.

Instead of sending more than a dozen gun-toting agents to arrest Mrs. Kimmel at home in a pre-dawn raid, the government could and should have done what it did with respect to at least one of her co-defendants: asked her to self-surrender by a certain date. *See, e.g.*, ECF No. 9 (government motion to quash arrest warrant for Douglas Hodge, who "self-reported" to the court). Why did the government not give Mrs. Kimmel this option? The prosecution will offer its excuses, but no rational or legitimate justification exists. For example, the government may respond that it merely employed the "default" level of force in arresting Mrs. Kimmel, and that the shock-and-awe treatment meted out to her is normal procedure for federal arrests. That a practice may be "standard protocol," however, does not make it constitutionally permissible. To be sure, law enforcement's use of "hyper-militarized, heavily armed police units" to carry out routine police business *has* become all too common in recent years.[3] SWAT team deployments have increased more than 1400% since the 1980s.[4] Previously, use of these heavily-armed, military-style tactical

---

[3] Radley Balko, *Overkill: The Rise of Paramilitary Police Raids in America* (Cato Institute, July 17, 2006), available at https://www.cato.org/sites/cato.org/files/pubs/pdf/balko_whitepaper_2006.pdf.

[4] Peter B. Kraska, *Militarization and Policing—Its Relevance to 21st Century Police*, 1 Policing 1, 6 (2007), available at https://cjmasters.eku.edu/sites/cjmasters.eku.edu/files/21stmilitarization.pdf.

teams was reserved for high-risk situations—such as terrorist attacks, hostage crises, and dangerous raids against violent felons—all circumstances where the police had *specific reason* to believe that such tactics were warranted.[5] Now, however, as Mrs. Kimmel's case exemplifies, SWAT and SWAT-like teams are commonly deployed in any number of nonviolent situations, which increases the threat of harm to both civilians and officers.[6] These are situations in which defendants are presumed innocent and are supposed to be afforded Due Process protections and freedom from cruel and unusual treatment while in and being taken into police custody.

To Mrs. Kimmel's knowledge, however, the government has never articulated an overarching interest that could justify this sort of blanket intrusion on the Fourth Amendment rights of citizens who, while subject to arrest, are presumed innocent until proven guilty. If it is in fact "standard protocol" to effectuate arrests in this manner, ***regardless*** of the charges or the person being arrested, then the policy itself fails to satisfy the Fourth Amendment, which demands "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. This is especially true in cases like this one, involving planned arrests, where the officers involved are in theory acting in accordance with policy and protocol, *i.e.,* not making split-second decisions on whether and how to effect an arrest. *Cf. Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) (where officials have time to make "unhurried judgments, upon the chance for repeated reflection," the bar for showing a due process violation is lower). The government should not, as a matter of constitutional law or policy, be conducting armed raids on individuals accused of completed, nonviolent offenses without providing them with an opportunity to self-surrender.

---

[5] ACLU, *War Comes Home: The Excessive Militarization of American Policing* 43 (2014), available at https://www.aclu.org/sites/default/files/assets/jus14-warcomeshome-report-web-rel1.pdf.
[6] Balko, *Overkill: The Rise of Paramilitary Police Raids in America* 43-82 (July 17, 2006).

The government's actions in this case were not "objectively reasonable" in light of the facts and circumstances surrounding what the government knew or could have known about Mrs. Kimmel and the nature of the charges against her. The agents violated Mrs. Kimmel's Fourth Amendment rights, causing her serious harm as a result.

## II.    The Government Violated Mrs. Kimmel's Due Process Rights When It Denied Her Access to Medical Care During Her Arrest.

The government's unconstitutional misconduct did not stop with Mrs. Kimmel's arrest. The utter disregard for her life-or-death medical situation—one entirely of the government's own making—also violated her substantive due process rights under the Fifth Amendment.[7]

### A.    The Objective Standard for a Substantive Due Process Claim

Substantive due process requires the government to provide medical care to persons who are injured while in custody. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).[8] Under prior law, courts applied the same standard to claims brought by pretrial detainees under the Due Process Clause as they did to claims by convicted prisoners under the Eighth Amendment. *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990). Under this formulation, a due process violation occurs when the arresting officers display "deliberate indifference" to "serious medical needs." *Id.* A serious medical need is one that has been diagnosed by a physician

---

[7] While this section addresses the government's violation of Mrs. Kimmel's Fifth Amendment rights caused by the government agents' unreasonable indifference to her medical condition, the First Circuit has not clearly defined when a "seizure" is complete for purposes of the Fourth Amendment, such that the protections of that amendment no longer apply. *See Moreau v. Gerardi*, 2010 U.S. Dist. LEXIS 124613, at *19 (D. Mass. Nov. 24, 2010) (it is an open question "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins," quoting *Graham*, 490 U.S. at 395 n.10). As the First Circuit's opinion in *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 74 (1st Cir. 2016), applies a substantive due process test without addressing the issue, Mrs. Kimmel will do the same here.

[8] In *City of Revere*, the Court applied substantive due process under the Fourteenth Amendment to an apprehension by municipal police. The analysis is the same under the Due Process Clause of the Fifth Amendment for individuals detained by federal authorities. *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3 (2d Cir. 2017) (constitutional analysis applied to state pretrial detainees "should be equally applicable to claims brought by federal pretrial detainees pursuant to the Due Process Clause of the Fifth Amendment"); *Malinski v. New York*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring) ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection.").

as mandating treatment, or that is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* Deliberate indifference required showing a "conscious failure to provide medical services" by the government official(s) involved, a subjective test. *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011).

The Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) changed the landscape for claims by pre-trial detainees—*i.e.*, individuals like Mrs. Kimmel who had not been convicted of a crime when their mistreatment occurred. *Kingsley* recognized that the Fourteenth Amendment (and by extension, the Fifth) provides a different constitutional standard than the Eighth Amendment for non-prisoner excessive force claims; while the Eighth Amendment prohibits only cruel and unusual punishment, "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Id.* at 400. The Court therefore held that, under the Due Process clauses, a government official need not be *subjectively* aware that their actions are unreasonable; an aggrieved individual need only show that the government's conduct was *objectively* unreasonable under the circumstances. *See id.* at 391-92.

*Kingsley* applies here. Since it was decided, several circuits have held that "medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry." *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *see Colbruno v. Kessler*, 928 F.3d 1156, 1164-65 (10th Cir. 2019); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018) (medical-need claim); *Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017) (conditions of confinement generally); *cf. Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) (not applying *Kingsley* but reasoning that the opinion called into "serious doubt" whether an aggrieved party must show officials "were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them"). The First Circuit has not

yet addressed whether *Kingsley's* reasoning extends to claims regarding the denial of medical care. *See Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018); *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 74 (1st Cir. 2016). But many district courts have applied *Kingsley's* objective test or applied the pre-*Kingsley* standard where the distinction made no substantive difference.[9]

This Court should likewise apply an objective test in addressing denials of the right to adequate medical care. Under this test, the question is whether an official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see Gordon*, 888 F.3d at 1125 (analyzing whether "defendant [failed to take] reasonable available measures to abate [a] risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved— making the consequences of the defendant's conduct obvious"). What the arresting agents actually knew about Mrs. Kimmel's dire medical condition is irrelevant; Mrs. Kimmel need only show that their actions were at least reckless and their "conduct was *objectively* unreasonable" under the circumstances. *Miranda*, 900 F.3d at 351, 352.

---

[9] *Compare Medeiros v. Martin*, 458 F. Supp. 3d 122, 128 n.1 (D.R.I. 2020) (applying objective unreasonableness standard); *Salcedo v. King*, 2018 U.S. Dist. LEXIS 61205, at *6 (D. Me. Apr. 11, 2018) (same), *adopted by* 2018 U.S. Dist. LEXIS 7718 ( May 8, 2018); *with Gomes v. US Dep't of Homeland Sec.*, 460 F. Supp. 3d 132, 148 (D.N.H. 2020) (reasoning without deciding the issue it was "likely" that civil detainees no longer need to show subjective deliberate indifference post-*Kingsley*); *Savino v. Souza*, 459 F. Supp. 3d 317, 327-31 (D. Mass. 2020) (finding detainees likely to succeed under either standard); *Couchon v. Cousins*, 2018 U.S. Dist. LEXIS 149109, at *6 (D. Mass. Aug. 31, 2018) (reasoning there was "much to be said" for extending *Kingsley* to pretrial detainee due process claims).

### B.   The Unreasonable Actions of the Arresting Agents Denied Mrs. Kimmel Medical Care and Violated Her Constitutional Rights.

The arresting agents' protracted disregard of Mrs. Kimmel's painful and painfully obvious medical condition violated her constitutional rights under any potentially-applicable standard: it was cruel and unusual, deliberately indifferent, and undeniably reckless and unreasonable.[10]

When the agents first escorted the Kimmel family into their living room, at 6:10 a.m. on March 12, Mrs. Kimmel was already having difficulty breathing and in obvious distress. Kimmel Decl. ¶ 17. Despite her appearance, her statements about her current condition, and her husband's statements about her prior heart history, agents led her out of the house, cuffed her hands behind her back, and placed her in a government car, leaving her family behind. *Id.* ¶¶ 17-18. Because the arrest was timed to catch the Kimmels while they slept, Mrs. Kimmel and the accompanying agents arrived at the MCC in San Diego around 7:00 a.m., too early to be booked. *Id.* ¶ 20. The agents forced Mrs. Kimmel to wait in the car outside, still handcuffed, for over an hour. *Id.* ¶¶ 20-21. During this time, in addition to the symptoms she had already displayed and described, Mrs. Kimmel reported feeling nauseous, thirsty, and lightheaded. *Id.* ¶ 20. Nevertheless, the agents denied her requests for water and use of a restroom. *Id.*

Not until approximately 8:20 a.m. did Mrs. Kimmel enter the MCC. Kimmel Decl. ¶ 21. What happened next is critical. The MCC staff—hardly medical professionals—quickly recognized that Mrs. Kimmel **could not be admitted** into the MCC because she required emergency medical treatment. *Id.* What did they see that the arresting agents had missed? Nothing. Nothing at all. The difference is not in what the MCC staff saw, but in how they responded. Unlike the

---

[10] Even if the Court were to apply a subjective test, the result would be the same. Subjective intent may be "inferred from behavior." *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011); *see also Miranda-Rivera*, 813 F.3d at 74 ("[a] factfinder can conclude that a government official was aware of a substantial risk of serious harm based on the fact that the risk was obvious"). And "a deliberate intent to harm is not required." *Battista*, 645 F.3d at 453 (describing standard as "a wanton disregard sufficiently evidenced by denial, delay, or interference with prescribed health care") (internal quotations and citations omitted).

arresting agents, that is, the jail officials did *not* recklessly disregard Mrs. Kimmel's obvious and visible signs of illness. The MCC staff directed the arresting agents to take her to the emergency room because that was obviously where she needed to be. *See id.*; *see* Litvak Decl. ¶ 18. Even then, the arresting agents acted as though they were still oblivious to what the MCC staff had found painfully obvious. They continued to shackle Mrs. Kimmel not just during the drive to the hospital, but even after she arrived at the Alvarado emergency room. Kimmel Decl. ¶¶ 22-23. The hospital staff, like the laypeople at the MCC, immediately recognized the seriousness of her condition and treated her as a critical case. *See id.* Only then was she finally unshackled. *Id.*

In short, Mrs. Kimmel went into severe cardiac distress immediately upon her arrest, as a direct consequence of the government's strong-arm arrest tactics. Notwithstanding their initial offer to call an ambulance, the arresting agents proceeded to deny her medical care as her symptoms worsened over the next three hours. Kimmel Decl. ¶¶ 17-18, 20-23. The agents' complete disregard of Mrs. Kimmel's urgent need for medical care—which, as shown by the response of the MCC staff, was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Gaudreault*, 923 F.2d at 208—violated her substantive due process rights. Indeed, as a result of the agents' indifference to her condition, and contrary to the Supreme Court's teaching that pretrial detainees "cannot be punished at all," *Kingsley*, 576 U.S. at 400, Mrs. Kimmel has *already been punished*: she spent five days in the hospital, three of them in the cardiac ICU, and she now and likely forever lives with a more dangerous cardiac condition. Kimmel Decl. ¶¶ 30-31; *see* Litvak Decl. ¶ 32. No one presumed innocent should be forced to undergo such cruel and unusual treatment at the hands of the government.

### III.    Mrs. Kimmel's Cardiac Infirmities Exacerbated by Her Unreasonable Arrest Will Deprive Mrs. Kimmel of Her Fifth and Sixth Amendment Rights at Any Trial.

#### A.    Mrs. Kimmel Is Now in a Riskier Cardiovascular State Because of the Government's Actions Than When She Was Arrested.

The government's misconduct has had a lasting impact of constitutional dimension. Mrs. Kimmel is sicker and weaker than she would have been, and runs a demonstrably greater risk of severe illness and death if she attempts to undergo the rigors and stresses of trial—especially if she attempts to exercise her constitutional right to testify in her own defense.

The physical consequences to Mrs. Kimmel are readily apparent and have been described in detail. TC, in and of itself, is a serious medical condition. It is especially serious when it causes the sort of complications that Mrs. Kimmel has suffered: a severe impairment of her left ventricular function; reduced ejection fraction to 10%-15%, well below a safe level; cardiogenic shock, an extremely serious condition with a high mortality rate; and exacerbated aortic regurgitation. Physician Decl. ¶¶ 8-9; Litvak Decl. ¶¶ 11-14, 17, 19-30. It is no exaggeration to say that Mrs. Kimmel could have died at any point during her arrest and subsequent treatment—before she was taken to Alvarado, during her aborted angiogram, or without the treatment and care she ultimately received from a specialized cardiac ICU at Scripps.

Her vulnerable state persists to the present day. Recent medical research indicates that many individuals who have experienced TC face long-term cardiac issues and gloomy prognoses.[11] A March 2018 study concluded that "patients with prior [TC] have persistent symptoms of heart

---

[11] *See, e.g.*, Beirne Decl. Ex. 19 at 3762-763 (noting that observational study "showed for the first time that [TC] has long-lasting clinical consequences including demonstrable symptomatic and functional impairment associated with persistent subclinical cardiac dysfunction," and that "post-[TC], patients can develop a persistent, long-term heart failure phenotype"); Beirne Decl. Ex. 20 at 144, 152 (for patients who have suffered from TC, "long-term mortality is higher compared with mortality in the general population, and outcomes resemble those of patients with acute coronary syndrome and ST-segment elevation myocardial infarction"). One study attributed this false assumption of rapid, full recovery to "[t]he swift recovery of the left ventricular ejection fraction after an acute episode of [TC]," even though more robust data shows that "patients with [TC] have a long-term prognosis comparable to that of patients with myocardial infarction" (*i.e.,* heart attack). Beirne Decl. Ex. 21 at 1587.

failure because of physical rather than emotional disability." Beirne Decl. Ex. 12 at 1044.[12] A May 2018 study noted that "recent observations suggest that TC … may not always be considered a fully reversible phenomenon, as demonstrated by the persistence of certain pathologies … in a significant proportion of cases," impacting both long-term prognosis and quality of life for TC patients. Beirne Decl. Ex. 22 at 19. And a June 2019 study concluded that TC patients who experienced left ventricular ejection fraction below 35%—Mrs. Kimmel's fell to 10-15%—are "at higher risk not only in the acute phase but also at long-term follow up." *Id.* Ex. 23 at 781-89. These studies and others indicate a precarious long-term prognosis for people like Mrs. Kimmel. *See id.* Ex. 24 at 929-38 (TC survivors experienced major adverse cardiac and cerebrovascular events at a rate of 9.9% per year and a death rate of 5.6% per year, reflecting "substantial rates of death and complications after the acute phase of the disease"); Litvak Decl. ¶¶ 13-14, 29, 32.

Mrs. Kimmel's long-term prognosis is likely even worse than the typical TC patient's, both because she had pre-existing cardiac issues and because she suffered such extreme symptoms during her first confirmed TC event. Litvak Decl. ¶¶ 13-14, 16-17, 20-30, 32; *see* Physician Decl. ¶¶ 8-11; Kimmel Decl. ¶¶ 3-9, 25, 28, 31-38. There is very little medical literature predicting the long-term prognosis for someone like Mrs. Kimmel,[13] who first had open-heart surgery to address an aneurysm, then experienced aortic regurgitation at varying levels, and has now experienced at least one severe TC episode. *See* Physician Decl. ¶¶ 4, 6, 11. She is a vulnerable anomaly, and if her own medical history is any guide, she is likely to suffer further cardiac damage from stressful

---

[12] This study found, among other long-term implications, that "after an acute episode of [TC] … the heart loses some of its wringing motion mostly in the regions acutely affected." Beirne Decl. Ex. 12 at 1046. The changes resulting from a TC incident thus "have an impact on the functional status and development of heart failure symptoms." *Id.* Another study similarly observed changes at the myocellular level indicating that recovery from [TC] may not be complete as early as previously thought, if ever. *See id.* Ex. 22 at 14-20.

[13] *See* Beirne Decl. Ex. 25 (noting that "only a few cases" of TC "are described in the literature, especially after mitral valve operations," and that "only a few cases have been reported after cardiac operations").

events. *See* Litvak Decl. ¶¶ 27, 29-30, 32 (noting concern that "a recurrent episode of [TC] could once again be life-threatening" for Mrs. Kimmel); Physician Decl. ¶¶ 4-11.

Specifically, because Mrs. Kimmel has now experienced at least one TC event as a result of the government's unreasonable arrest tactics (*see* Physician Decl. ¶ 7 ("It is my opinion that Mrs. Kimmel's TC incident was without a doubt a direct result of her arrest on March 12, 2019.")), she is at greater risk of suffering from another such event during trial. *Id.* ¶ 10 ("It is my opinion that she is more likely to have another incident of [TC] than someone else who has not had a [TC] event."); Litvak Decl. ¶¶ 30, 32 ("In my medical opinion, Mrs. Kimmel is at risk for a recurrent episode of TC in the setting of a highly stressful and unpredictable event such as a trial," and Mrs. Kimmel "is at risk for developing cardiogenic shock or death if TC were to recur."). Recurrence of TC in most instances occurs within 4 years. Beirne Decl. Ex. 26 at 58-60; *see* Litvak Decl. ¶ 29. If it does recur, it will be especially dangerous to a patient with Mrs. Kimmel's cardiac profile. One group of physicians, reporting on the first known case of heart failure due to TC in a patient with mitral and aortic regurgitation (both of which Mrs. Kimmel has), observed that "a recurrent [TC] syndrome … could impair the patient's prognosis." Beirne Decl. Ex. 27 at 72-73. Although limited data on recurrence are available, these physicians noted five-year recurrence rates of 5%-22%, with the second episodes occurring 3 months to 10 years after the first. *Id.*; *see* Litvak Decl. ¶ 29. There is no known treatment to mitigate or prevent the recurrence of TC. Litvak Decl. ¶ 31.

Moreover, Mrs. Kimmel's first diagnosed TC event showed that she is in fact, and not just in theory, vulnerable to the most life-threatening complications that may accompany this condition, including dangerously low ejection function (in her case, a less than 15% heart pumping capacity) and cardiogenic shock. Litvak Decl. ¶¶ 17, 20, 22, 24-27, 30. One study has concluded that cardiogenic shock complicating TC "may constitute a marker of underlying disease severity

and could identify a masked heart failure phenotype with increased vulnerability to catecholamine-mediated myocardial stunning." Beirne Decl. Ex. 28 at 928. In other words: cardiogenic shock "is associated with worse short- and long-term prognosis" in TC. *Id.*[14]

Mrs. Kimmel's TC event was triggered by the same sort of severe emotional stressors that a criminal trial presents.[15] Litvak Decl. ¶¶ 12, 26, 30, 32. Physician Decl. ¶¶ 6-8, 11. Mrs. Kimmel is now at greater risk of another TC incident than she was before her arrest. Physician Decl. ¶ 10; Litvak Decl. ¶¶ 30-32. This necessarily creates significant concerns for her ability to withstand trial and handicaps her in her decision to testify at trial. Because of the government's actions, she is forced to put herself at risk of another TC event and at greater risk of death in order to avail herself of her constitutional right to require the government to prove the charges against her, as well as her constitutional right to testify. *See* Litvak Decl. ¶¶ 30-32.

### B.   The Government's Conduct Infringes Mrs. Kimmel's Fundamental Constitutional Right to Testify in Her Own Defense.

Because Mrs. Kimmel has been greatly handicapped in her ability to testify on her own behalf at trial, the government's misconduct has infringed a fundamental constitutional right.

A defendant "has a 'fundamental constitutional' right to testify in [her] own defense, and … the right must be 'unfettered.'" *Owens v. United States,* 483 F.3d 48, 58 (1st Cir. 2007) (quoting *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987), and *Harris v. New York*, 401 U.S. 222, 230 (1971)). The unfettered right to testify on one's own behalf at a criminal trial "has sources in several provisions of the Constitution." *Rock*, 483 U.S. at 51. First, "[i]t is one of the rights that 'are essential to due process of law in a fair adversary process,'" *id.*, quoting *Faretta v. California*, 422

---

[14] The current pandemic adds another risk factor to the mix. Emerging evidence about potential long-term damage to the heart caused by COVID-19 suggests that the virus may further increase the risk of someone with preexisting heart conditions, like Mrs. Kimmel. *See* Litvak Decl. ¶ 33; Physician Decl. ¶ 12.

[15] *See* Beirne Decl. Ex. 29  at 1-2 ("emotional/physical stressors that can trigger a severe catecholamine surge may be the most important risk factor for TC," and "the probability of recurrence and of future cardiac events is not necessarily low"; "TC patients may represent a cohort that is predisposed to cardiogenic insult from catecholamine overdrive").

U.S. 806, 819, n.15 (1975), and thus is protected by the Fifth and Fourteenth Amendments' Due Process Clauses. Due process prohibits the government from unjustly interfering with the manner in which a defendant wishes to present a defense, including her right to present witnesses and testify in her own behalf. *See Webb v. Texas*, 409 U.S. 95, 98 (1972) (threatening comments by judge that "effectively drove" key defense witness off the stand violated defendant's constitutional right to present his defense). Due process requires that criminal prosecutions "comport with prevailing notions of fundamental fairness," demanding a "meaningful opportunity" for criminal defendants "to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984).

The right to testify is "also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to 'call witnesses in his favor,'" since "the most important witness for the defense in many criminal cases is the defendant himself." *Rock*, 483 U.S. at 52. That may well be the case here, where Mrs. Kimmel's state of mind is a critical and strenuously-disputed element of the charges against her. Finally, the opportunity to testify "is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony," because the right to *decline* to testify in one's own defense implies the right to *elect* to testify. *Id.* at 52-53. For all of these reasons, "there can be no doubt that the right to testify in one's own defense is among the most fundamental constitutional guarantees afforded to every person accused of a crime." *Commonwealth v. Teixeira*, 76 Mass. App. Ct. 101, 105 (2010).

Here, the government's conduct has placed significant fetters on Mrs. Kimmel's "right to control the manner and substance of the defense" in fundamental ways, violating her Fifth and Sixth Amendment rights. *United States v. Stein (Stein I),* 435 F. Supp. 2d 330, 357 (S.D.N.Y. 2006). There is no doubt that attending one's own criminal trial, directing one's own defense, and in particular taking the stand at that trial, are emotional stressors. There is equally no doubt that—

as a direct result of the government's misconduct—Mrs. Kimmel now runs a greater risk of experiencing severe, life-threatening cardiac issues when she experiences such stress. Litvak Decl. ¶¶ 29-32; Physician Decl. ¶¶ 10-11. As a consequence of the government's misconduct, then, Mrs. Kimmel is being forced to choose between risking her life (by taking the stand) and risking her liberty (by not testifying on her own behalf). This is an impossible and unjust choice. The Constitution requires that a waiver of the right to testify must be made "intelligently, voluntarily and knowingly," but Mrs. Kimmel cannot make such a voluntary election here. *Jenkins v. Bergeron*, 67 F. Supp. 3d 472, 476 (D. Mass. 2014) (Gorton, J.), *aff'd*, 824 F.3d 148 (1st 2016). The government has taken Mrs. Kimmel out of the driver's seat of her own defense, see *Stein I*, 435 F. Supp. 2d at 358, and it should bear the burdens of its misconduct.

## IV.    Dismissal of the Charges Against Mrs. Kimmel Is the Only Appropriate Remedy.

### A.    These Constitutional Infringements Require a Remedy.

Constitutional wrongs demand redress; "every right, when withheld, must have a remedy, and every injury its proper redress." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). The general rule, including for violations of Sixth Amendment rights, is that the remedy "should be tailored to the injury suffered from the constitutional violation" while not "unnecessarily infring[ing] on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). The court must "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant . . . a fair trial," *if* one is possible at all. *Id.* at 365. Where a defendant suffers "continuing prejudice" as a result of the government's misconduct that cannot be cured by less drastic measures, *id.* at 365 n.2, or where there exists a "substantial threat thereof," *id.* at 365, "[d]ismissal of an indictment for Fifth and Sixth Amendment violations is always an available remedy." *Stein v. KPMG, LLP*, 486 F.3d 753, 762-63 (2d Cir. 2007).

In determining the appropriate remedy here, the court must be attuned to the unusual, and possibly unique, circumstances. It is irrelevant whether a differently-situated defendant would have better withstood the government's mistreatment. As with common law torts, under the "thin-skull" or "eggshell skull" rule, a constitutional wrongdoer "takes his victim as he finds [her]." *Doty v. Sewall*, 908 F.2d 1053, 1059 (1st Cir. 1990); *Figueroa-Torres v. Toleda-Davila*, 232 F.3d 270, 274-76 (1st Cir. 2000) (trial court properly applied the rule in Section 1983 suit based on use of excessive force by an arresting officer). Causation requirements in constitutional cases were "not intended to … immunize the exacerbation of a pre-existing condition, leaving the weakest and most vulnerable members of society with the least protection from police misconduct." *Dunn v. Denk*, 54 F.3d 248, 251 (5th Cir. 1995). Consequently, when the court fashions a remedy for the violations of Mrs. Kimmel's constitutional rights, it can and should take into account the full extent of her injuries, and should not be deterred or distracted by arguments that a "stronger" defendant might have been able to absorb the same level of physical and constitutional insult without losing the ability to participate effectively in her defense.

### B.      Dismissal Is the Only Effective—and the Only Appropriate—Remedy.

When it damaged Mrs. Kimmel's ability to control her defense, the government inflicted an injury that cannot be remedied short of dismissal of the Indictment. Nothing can substitute for a criminal defendant's decision to testify, which is a fundamental part of her "Sixth Amendment-secured autonomy." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1511 (2018).

Recent Supreme Court jurisprudence confirms that this is a structural error not amenable to a harmlessness analysis. This court must apply the "fundamental legal principle that a defendant must be allowed to make [her] own choices about the proper way to protect [her] own liberty." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017); *Jones v. Barnes*, 463 U.S. 745, 751 (1983). For example, when a criminal defendant is unjustly denied the Sixth Amendment right to

counsel of choice, a conviction must be reversed without a showing of prejudice. *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). The same is true for counsel's admission of a client's guilt over the client's express objection. *McCoy*, 138 S. Ct. at 1511; *see id.* ("Violation of a defendant's Sixth Amendment-secured autonomy … is not subject to harmless-error review."). An error is also structural "if the effects of the error are simply too hard to measure," as when the defendant is prevented from selecting her own attorney. *Weaver*, 137 S. Ct. at 1908.

The injury inflicted here—imposing a life-threatening risk and severely handicapping Mrs. Kimmel's ability to choose freely whether or not to testify, without risking her life—is just the sort of denial of Sixth Amendment-secured autonomy that gives rise to a structural error. *McCoy*, 138 S. Ct. at 1511. Indeed, a defendant's right "to present [her] own version of events in [her] own words" is "*[e]ven more fundamental* to a personal defense than the right of self-representation," which the Supreme Court has never hesitated to deem a structural error when transgressed by the government. *Rock*, 483 U.S. at 52 (emphasis added). Given the fundamental importance of the defendant's right to testify, a court "could not logically term 'harmless' an error that presumptively kept the defendant from [doing so]." *Luce v. United States*, 469 U.S. 38, 42 (1984). The government's conduct in this case has "block[ed] [Mrs. Kimmel's] right to make fundamental choices about [her] own defense," *McCoy*, 138 S. Ct. at 1511, because "[a] defendant's opportunity to conduct [her] own defense by calling witnesses is incomplete if [she] may not present [herself] as a witness." *Rock*, 483 U.S. at 52. It is, moreover, impossible to measure the harm Mrs. Kimmel would suffer from being deprived of the opportunity to testify in her own defense, a further indication of the structural nature of the constitutional violation. *See McCoy*, 138 S. Ct. at 1511.[16]

---

[16] A denial of a defendant's right to testify is typically reviewed under an ineffective assistance of counsel standard. *See, e.g.*, *Owens*, 483 F.3d at 57. That standard has no application here, where it is the government's, not counsel's, actions that will deprive Mrs. Kimmel of this ability to testify in her own defense.

In the ordinary course, the "cure" for a constitutional violation of this magnitude would be a new trial where Mrs. Kimmel would be given the opportunity to testify. That option, of course, is unavailable here. If Mrs. Kimmel cannot testify, or testify effectively, because of her injuries and the risks they have created, then no remedy short of dismissal of the Indictment will suffice. No available trial remedy—*e.g.*, exclusion of evidence or jury instructions—and no available medical remedy could effectively level the playing field and deny the government the windfall that its conduct has generated. There is, however, a direct causal connection between (a) the government's use of excessive force in arresting Mrs. Kimmel, and (b) Mrs. Kimmel's current inability to exercise her trial rights effectively. Given that the government has handicapped Mrs. Kimmel in her right to choose whether to testify at *any* trial in this case, whether now or in the future, dismissal is the only remedy that can redress the constitutional injury caused by the government's conduct. *Cf. United States v. Straub*, 538 F.3d 1147, 1162 (9th Cir. 2008) (vacating and remanding with instructions to dismiss indictment if prosecution refused to immunize key defense witness, because failure to do so would result in fundamentally unfair trial); *Commonwealth v. Fontaine*, 402 Mass. 491, 495-96 (1988) (dismissal of criminal charges for failure of prosecution to comply with "constitutional mandates" is appropriate where government misconduct "result[ed] in irremediable harm" to defendant's opportunity to obtain a fair trial) (internal quotation marks omitted). Mrs. Kimmel should not be forced to find out if she can literally *survive* a trial or survive testifying in her own defense to determine how significant the government's infringement of her rights actually is.

Moreover, although a showing of prejudice is not required for this denial of Mrs. Kimmel's Fifth and Sixth Amendment rights, the prejudice to Mrs. Kimmel is incontrovertible here. Mrs. Kimmel's testimony will be critical to her defense. One of the key issues at trial will be her

29

subjective state of mind—did she lack specific intent to commit the underlying crimes because she believed that she was making legitimate payments through Rick Singer to Georgetown and USC? No matter how the government presents its case, Mrs. Kimmel will be "the most important witness for the defense …." *Rock*, 483 U.S. at 52. If Singer testifies that he gave Mrs. Kimmel reason to understand the payments as bribes, he would be lying and Mrs. Kimmel's credible testimony to the contrary would be paramount. And even if Singer does not testify, Mrs. Kimmel's testimony may be essential to rebut any inference of culpability that the government can generate through the selective, slanted use of circumstantial evidence. Cross-examination is not an adequate substitute for a coherent and credible narrative from the defendant herself. *See, e.g., Green v. United States*, 365 U.S. 301, 304 (1961) ("[T]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself."). Even if prejudice must be shown, the prejudice to Mrs. Kimmel of being forced to risk her life in order to testify in her own defense is an insurmountable hurdle to conducting a fair trial.

## CONCLUSION

Mrs. Kimmel respectfully requests that the Court dismiss the charges against her in the Fourth Superseding Indictment, and grant other such relief as the Court deems just and proper.

Respectfully submitted,

/s/ *R. Robert Popeo*
R. Robert Popeo (BBO # 403360)
Mark E. Robinson (BBO # 423080)
Eóin P. Beirne (BBO # 660885)
Cory S. Flashner (BBO # 629205)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
(617) 542-2241 (fax)
rpopeo@mintz.com
mrobinson@mintz.com
ebeirne@mintz.com
csflashner@mintz.com

**Counsel for Elisabeth Kimmel**

DATED: May 28, 2021

## **RULE 7.1 CERTIFICATION**

Undersigned counsel certifies that, on May 19, 2021, counsel for the Defendant conferred with counsel for the government, and the government does not assent to the Motion.

## **CERTIFICATE OF SERVICE**

I, R. Robert Popeo, counsel for the Defendant, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF, and paper copies will be sent to those indicated as non-registered participants on May 28, 2021.

/s/ *R. Robert Popeo*
R. Robert Popeo (BBO # 403360)