UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG-13 |
| | ) | |
| ELISABETH KIMMEL, | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS INDICTMENT [ECF NO. 1877]**

The government respectfully submits this response in opposition to the defendant Elisabeth
Kimmel's motion to dismiss the Fourth Superseding Indictment ("FSI") based on alleged
constitutional violations.  ECF No. 1877.

More than two years ago, the Court authorized 32 arrest warrants for parents charged with
engaging in a sweeping scheme to use fraud and bribery to secure their children's admission to
college.  Since that time, nearly two dozen defendants have pled guilty and been sentenced, and
one was pardoned.  Kimmel is among eight remaining defendants scheduled for trial in September.
Over the past 27 months, she has filed or joined some seven motions to dismiss, on a variety of
grounds.  All have been denied.

In the wake of those denials, and with trial now just months away, Kimmel moves anew to
dismiss the indictment against her, this time citing purported "constitutional violations" stemming
from her arrest – an arrest that she now contends involved "paramilitary tactics," "military-style
force to arrest" her, and "utter disregard" for her health.  None of that is true.

The agents who arrested Kimmel followed standard protocol.  They executed a valid
warrant, and used no force.  Even when they handcuffed Kimmel for purposes of transportation,

they moved the handcuffs from her back to her front to make her more comfortable.  They offered

her medical care, which she declined, and later took her to the hospital.

And even if her factual assertions had merit – which they do *not* – Kimmel's motion fails

as a legal matter.  Indeed, she cites *not a single precedent* in which an indictment was dismissed

for the purported constitutional violations she asserts.  For these reasons, and the reasons set forth

below, her motion should be denied.

## I.   RELEVANT BACKGROUND

### A.   The Charges

The Court is by now familiar with the facts of this case, and so the government will not

rehearse them in detail here.  The indictment alleges that Kimmel "participated in the side-door

scheme twice, once in 2012 to secure admission for her daughter to Georgetown University as a

purported tennis recruit and once in 2017 to secure admission for her son to USC as a purported

track and field athlete."  ECF No. 1334 at 13.  Ultimately, she is alleged to have paid approximately

$525,000 in bribes to facilitate the admission of her children to college as recruited athletes for

sports they did not play.  FSI ¶¶ 165–81.

### B.   The Arrest

On March 11, 2019, Chief Magistrate Judge Kelley authorized arrest warrants for 32

parents based on a 536-paragraph complaint charging them with conspiracy to commit mail fraud

and honest services mail fraud, in violation of 18 U.S.C. § 1349.  ECF Nos. 3, 4.  Agents executed

the warrants the next day, arresting all but a handful of defendants who were not home at the time.

#### 1.   The Agents Arrive to Execute a Court-Authorized Arrest Warrant

Kimmel's arrest was memorialized, pursuant to standard FBI protocol, in an FBI Form

302.  As set forth in that document, arresting agents from the FBI and the IRS arrived at Kimmel's

residence at approximately 6:03 a.m.  *See* Ex. A at 1; ECF No. 4 at 21.  As Kimmel concedes, the agents were aware that her husband was licensed to carry a concealed firearm.  ECF No. 1879-1 at ¶ 19; ECF No. 1878 at 18.

The agents knocked and announced their presence.  Ex. A at 1; ECF No. 1879-30.  As reflected in Kimmel's doorbell surveillance video, the agents announced "police, warrant, please come to the door."  ECF No. 1879-30.  Several of the agents had unholstered their handguns.  *Id.* Kimmel's husband initially refused to open the door, but complied when the agents repeated that they had a warrant.  Ex. A at 1.  Agents requested that the remaining occupants come to the door, but observed at least two people on the second-floor balcony run back into the rear of the house. *Id.*  The agents did not follow.  *Id.*  Instead, they continued to request, several times, that Kimmel come to the door from where she was upstairs.  *Id.*

When Kimmel came downstairs, agents accompanied her and her family to the living room. Ex. A at 2; ECF No. 1879-1 at ¶ 17.  Kimmel was not handcuffed, restrained, or otherwise touched by the agents.  Ex. A at 2; ECF No. 1879-1 at ¶¶ 15–17.

### 2.      Kimmel Refuses the Agents' Offer of Medical Care

After the agents advised Kimmel that they had an arrest warrant for her participation in a conspiracy related to college admissions, she appeared stressed and told them that her heart was racing.  Ex. A at 2.  At that point, Kimmel's husband told the agents that she had heart surgery several years earlier, but that "her latest check up had not given them concern."  *Id.*  He told Kimmel that she was likely just experiencing panic and "needed to calm her self down."  *Id.*  He noted that Kimmel's reaction "was probably the same thing that happened to her" on a previous occasion when they had to call an ambulance, "but it turned out to be nothing."  *Id.*  An agent checked Kimmel's pulse, which was normal.  *Id.*

The agents offered to call an ambulance to take Kimmel to the hospital. *Id.*; ECF No. 1879-1 at ¶ 17. As Kimmel concedes in an affidavit appended to her motion, she declined. ECF No. 1879-1 at ¶ 17; *see* Ex. A at 2. Kimmel did not request medical care or an ambulance at any time thereafter. *See* Ex. A at 2–3; ECF No. 1879-1 at ¶¶ 17–22.

The agents allowed Kimmel to go upstairs, where she brushed her teeth, used the restroom, and changed her clothes. Ex. A at 2. Only at that point – approximately 45 minutes after they had arrived to execute the warrant – did the agents place Kimmel in handcuffs for purposes of transporting her to the Metropolitan Correctional Center ("MCC"), in San Diego, pending her initial appearance. *Id.* The agents and Kimmel arrived at the MCC approximately 25 minutes later, but the facility was not yet ready to process her. *Id.* While waiting, the agents moved Kimmel's handcuffs from her back to her front, and when she alerted them that she was nauseated, they opened the windows and allowed her to lay down on the back seat of the car. *Id.* at 2–3.

### 3.      The Agents Transport the Defendant to the Hospital

When the MCC opened for processing, the agents accompanied Kimmel inside and allowed her to use the restroom. *Id.* at 3. Shortly thereafter, the MCC advised the agents that Kimmel would not be medically cleared for intake due to tightness in her chest and a pre-existing broken metatarsal in her foot. *Id.*

At that point, the agents brought Kimmel directly to the emergency room at Alvarado Hospital. *Id.* On the way, Special Agent Stephanie Schuld called Kimmel's husband to tell him that they were taking her to the hospital. *Id.*; ECF No. 1879-1 at ¶ 17. Mr. Kimmel asked Special Agent Schuld if she could do him a "favor" and "do whatever it took to get her back downtown so she could be seen by a judge the same day" and not have to spend a night in the MCC. Ex. A at 3. Special Agent Schuld explained that they would be as expeditious as possible, but would defer

to the medical professionals.  *Id.*  The agents also allowed Kimmel to speak with her husband via speakerphone on the way to the hospital (a fact neither Kimmel's brief, nor her affidavit, mentions).  Ex. A at 3; *see* ECF No. 1878 at 6; ECF No. 1879-1 at ¶ 22.  When Kimmel told her husband about tightness in her chest, he told her that "this was probably like the last time she felt this way, but [she] turned out to be fine."  Ex. A at 3.  He further told her that "she was likely just reacting to the stress of the morning" and reminded her that "she had felt this way before and she had been okay then."  *Id.*  He directed Kimmel to tell the hospital workers that she felt "fine" so that she could make her initial appearance the same day and avoid spending the night in the MCC. *Id.*

The agents arrived at the emergency room with Kimmel approximately 15 minutes after departing the MCC.  *Id.*  Kimmel was immediately placed in a curtained-off room, and the agents removed her handcuffs as the hospital began running tests.  *Id.* at 3–4.  Special Agent Schuld called Kimmel's attorney and told him about the arrest warrant and Kimmel's health status.  *Id.* at 4.  She also called Kimmel's husband again and told him that the hospital was running tests.  *Id.*  When the hospital informed the agents of concerns with some of Kimmel's medical results, Special Agent Schuld called Kimmel's husband yet again, told him about the results, and advised that he could come see Kimmel at the hospital.  *Id.*

When Mr. Kimmel arrived, the agents sat with Kimmel and her husband in the emergency room.  *Id.*  Mr. Kimmel, a former state prosecutor, asked if they were being recorded.  *Id.*  When the agents responded that they were not recording, Mr. Kimmel asked whether they could tell him anything about the case.  *Id.*  For her part, Kimmel asked what was being reported about her in the media.  *Id.*  The agents explained that they could not share any further information about the case,

and they reminded Kimmel and her husband of Kimmel's *Miranda* rights.  *Id.*  Mr. Kimmel thanked the agents for the reminder.  *Id.*

Several hours later, a cardiologist visited Kimmel and recommended an angiogram.  *Id.* After the Kimmels conferred with another cardiologist, Kimmel elected to undergo the procedure. *Id.*  In the meantime, following consultation among Kimmel's attorney, the United States Attorney's Office, and the FBI Supervisory Special Agent, Kimmel was released from FBI custody.  *Id.* at 5.

Before departing, Special Agent Schuld expressed her sympathy to Kimmel and her husband for Kimmel's health issues.  *Id.*  Mr. Kimmel sarcastically suggested that the agent was "admitting that the FBI had caused Kimmel's health to decline."  *Id.*  Special Agent Schuld stated that the agents were *not* responsible for Kimmel's health issues, but that she was simply offering empathy for Kimmel's circumstances on a personal level.  *Id.*  Mr. Kimmel said his remark had been in jest, and Kimmel, unprompted, told the agents that "maybe they had saved her life."  *Id.* Kimmel's motion and her affidavit omit the majority of this exchange, other than to accuse Special Agent Schuld of saying, "I'm sorry we caused all of this."  ECF No. 1878 at 7; ECF No. 1879-1 at ¶ 27.

## II.   ARGUMENT

Kimmel's motion advances three arguments.  First, she contends that the "military-style assault" used to arrest her constituted excessive force, and thus an unreasonable seizure, in violation of the Fourth Amendment.  ECF No. 1878 at 11–16.  Second, she asserts that the agents violated her substantive due process rights by demonstrating "utter disregard" for her medical issues and "den[ying] her access to medical care during her arrest," in a manner that was "cruel and unusual, deliberately indifferent, and undeniably reckless and unreasonable."  *Id.* at 16–20.

<u>Third</u>, she maintains that she is medically unfit to stand trial, and that the execution of her arrest warrant 27 months ago precipitated her medical issues and thereby stripped her of her Sixth Amendment rights.  *Id.* at 21–26.  Kimmel's claims are factually without merit and legally frivolous.

### A.      Background Legal Principles

"Although dismissing an indictment on substantive due process grounds is not unprecedented, it is extremely rare" and a "drastic step."  *See, e.g.*, *United States v. Stokes*, 124 F.3d 39, 46 (1st Cir. 1997).[1]  "In the normal course of events, a facially valid indictment returned by a duly constituted grand jury calls for a trial on the merits."  *United States v. George*, 839 F. Supp. 2d 430, 434–35 (D. Mass. 2012) (Gorton, J.) (quoting *Stokes*, 124 F.3d at 44).  Dismissal of an indictment, on any grounds, is an "extraordinary step" reserved for "extremely limited circumstances."  *Id.* at 435; *see also United States v. Li*, 206 F.3d 56, 62 (1st Cir. 2000) ("Because the public maintains an abiding interest in the administration of criminal justice, dismissing an indictment is an extraordinary step.").

### B.      The Defendant's "Excessive Force" Claim Is Legally Unprecedented and Factually Meritless

As an initial matter, Kimmel does not, because she cannot, cite a single federal criminal case anywhere in the country in which a court dismissed an indictment on the basis that an arrest was conducted with excessive force in violation of the Fourth Amendment.  *See* ECF No. 1878 at 11–16, 26–30.  That is unsurprising.  Even where the Fourth Amendment is violated, the appropriate remedies are (i) suppression of evidence pursuant to the exclusionary rule for an unreasonable search, or (ii) a collateral civil rights lawsuit under 42 U.S.C. § 1983 for an unreasonable seizure.  Dismissal of an indictment is not.  Indeed, the Supreme Court itself has

---

[1] Unless otherwise noted, all internal quotation marks and citations are omitted.

noted that it has "not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of [an] indictment" because "[t]he remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression." *United States v. Morrison*, 449 U.S. 361, 366 (1981). And the First Circuit has noted that, in the context of an unreasonable search, "[t]he exclusionary rule," not dismissal of a valid indictment, is the "judicially created remedy designed to effectuate the Fourth Amendment guarantees against unreasonable searches and seizures . . . ." *United States v. Aiudi*, 835 F.2d 943, 945 (1st Cir. 1987). Likewise, in the context of a seizure, as summarized by the Second Circuit and reaffirmed by others, "custody obtained by executing an arrest warrant is not invalidated because of the use of excessive force, even though the defendant might have damages against the government agents involved." *United States v. Reed*, 639 F.2d 896, 902 (2d Cir. 1981); *see also United States v. Arista-Barragon*, 9 F. App'x 590, 592 (9th Cir. 2001) (affirming denial of motion to dismiss: "Defendant made no showing that his alternative remedies (suppression of evidence for an improper stop, or a civil action for excessive force during an arrest) were inadequate."). Tellingly, in the section of her motion arguing that dismissal is the "only appropriate remedy" for the violations she alleges, Kimmel neglects to mention the Fourth Amendment, unreasonable seizures, or excessive force at all. ECF No. 1878 at 26–30. Her arguments and requested relief are legally groundless, full stop.

But even were the Court to evaluate the reasonableness of Kimmel's arrest, her motion would fail for several independent reasons.

<u>First</u>, it is undisputed that agents arrested Kimmel on the basis of a valid warrant. *Supra* at 2–3. Throughout her motion, Kimmel suggests that the decision to arrest her at all was unreasonable because she was charged with a non-violent crime, had no criminal record, and posed little risk of flight. ECF No. 1878 at 4, 11, 15. But the Supreme Court has repeatedly held – even

when addressing Fourth Amendment claims arising out of arrests of the *wrong suspect* – that seizures authorized by valid arrest warrants supported by probable cause are presumptively reasonable and give rise to no constitutional violation.  "Absent an attack on the validity of the warrant under which [a defendant] was arrested," a seizure authorized by a court-authorized arrest warrant "gives rise to no claim under the United States Constitution."  *Baker v. McCollan*, 443 U.S. 137, 143–44 (1979) (holding that person who was arrested and detained for three days in jail based on mistaken identity had no Fourth Amendment claim due to arrest warrant); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The Fourth Amendment is not violated by an arrest based on probable cause[.]").  The First Circuit has put it even more bluntly: when a "warrant naming [the arrestee] [i]s valid on its face, probable cause exist[s] for the arrest and, hence, the Fourth Amendment [i]s not implicated" and even "drop[s] out of the equation" entirely.  *Brady v. Dill*, 187 F.3d 104, 108 (1st Cir. 1999) (holding that arrestee who was mistakenly detained for two days had no Fourth Amendment claim).  And finally, Judge Saris squarely rejected a similar dismissal motion in *McBride*, where the defendant argued that his arrest on a valid warrant violated the Fourth Amendment:

> The government's request for an arrest warrant, rather than a summons, also does not merit dismissal. . . . The defendant's argument seems to be that by requesting an arrest warrant rather than a summons when he posed no risk of flight, the government violated . . . the Fourth Amendment's prohibition of "unreasonable seizures" of the person. However, the law requires only that the warrant is supported by probable cause.  Here, the [charging document] itself was sufficient to establish probable cause.

*United States v. McBride*, No. 13-10195-PBS, 2014 WL 2987014, at *4 (D. Mass. July 1, 2014).

Second, the only "force" applied to Kimmel during her arrest was handcuffing, and courts have repeatedly held that handcuffing defendants for similar periods of time is reasonable.  The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical

9

coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* Here, Kimmel was not pushed, shoved, or aggressively touched in any way during the course of her arrest. Rather, she was placed in handcuffs for approximately two-and-a-half hours for her transport from her residence to the MCC, and from the MCC to the hospital. *Supra* at 4–5; *see also* Ex. A at 2–4. Further, Kimmel spent less than one hour handcuffed behind her back because the agents moved her handcuffs to the front of her body while waiting for the MCC to begin processing her. Ex. A at 2. Handcuffing defendants – including non-violent white-collar defendants – during arrests and transportation is routine. *See, e.g.*, *Muehler v. Mena*, 544 U.S. 93, 100 (2005) (three hours in handcuffs did not constitute excessive force). As the First Circuit held in *Calvi*, "there is no evidence" of excessive force when an officer merely places an arrestee in handcuffs for transport:

> Standard police practice called for cuffing an arrestee's hands behind her back and [the officer's] decision not to deviate from this practice was a judgment call, pure and simple. He handcuffed [the arrestee] in the customary manner and kept her in handcuffs for no more than the time reasonably necessary to transport her to the lockup. That is the end of the story.

*Calvi v. Knox Cty.*, 470 F.3d 422, 428 (1st Cir. 2006); *see also Pena-Borrero v. Estremeda*, 365 F.3d 7, 12 (1st Cir. 2004) (holding that "handcuffing that was accomplished by pushing [arrestee's] arms behind his back, causing injury" was reasonable and the degree of force "typically attendant to an arrest"); *Inman v. Siciliano*, No. 10-10202-FDS, 2012 WL 1980408 at *11 (D. Mass. May 31, 2012) ("Generally, detention in handcuffs for a moderate amount of time alone does not constitute excessive force.").

> Third, Kimmel's motion hyperbolically seeks to transform a run-of-the-mill and by-the-book arrest into a "military-style assault on [her] home," involving "paramilitary tactics" during a "raid." ECF No. 1878 at 12–13. This is fantasy. The agents knocked and announced to execute

a warrant, waited for Kimmel to come to the door, spent 45 minutes checking her health and allowing her to collect herself, wash up, and get dressed while unrestrained, and placed her in handcuffs only upon leaving the residence. *Supra* at 3–4. The agents never pointed a firearm at Kimmel, ordered her to the ground, yelled at her, or according to her affidavit, even so much as touched her at all until they placed her in handcuffs. ECF No. 1879-1 at ¶¶ 15–17; Ex. A at 1–2.

Kimmel's attempt to compare the agents' conduct in executing her arrest to cases like *Stamps* – in which an officer shot an elderly, non-resisting man in the head with an assault rifle from point-blank range while he was pinned to the floor – strains credulity. ECF No. 1878 at 13–14 (citing *Stamps v. Town of Framingham*, 813 F.3d 27 (1st Cir. 2016)).[2] Indeed, although the agents did not do so here, even "enter[ing] a [residence] brandishing weapons and issuing orders to the residents" pursuant to a warrant is not excessive force. *See Lucas v. City of Bos.*, No. 07-10979-DPW, 2009 WL 1844288, at *19–20 (D. Mass. June 19, 2009) (collecting cases, but holding that two officers pointing guns at a nine-year-old girl's head, forcing her hands behind her back, and shouting expletives at her could prove to be unreasonable).

---

[2] The remaining out-of-Circuit authorities Kimmel cites (ECF No. 1878 at 12–14) are inapposite and, if anything, support the reasonableness of the agents' conduct in executing her arrest. *See, e.g.*, *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001) (concluding that "simply holding [a] weapon in a fashion ready for immediate use" in executing warrants was not excessive, but denying qualified immunity to officers who pointed assault rifles at numerous school-aged children and ordered them to the ground, and chased a four-year-old boy into a house while pointing a laser-scoped assault rifle at the child's back); *see also Terebesi v. Torreso*, 764 F.3d 217, 232 (2d Cir. 2014) (use of a SWAT team did not violate the Fourth Amendment, but shooting and killing a suspect on the mistaken belief that he was returning fire did); *Estate of Smith v. Marasco*, 430 F.3d 140, 150–52 (3d Cir. 2005) (storming an elderly suspect's house using tear gas and flash-bang grenades was unreasonable in executing arrest warrant for simple assault, but decision to employ a SWAT-type team was reasonable); *Meredith v. Erath*, 342 F.3d 1057, 1061–62 (9th Cir. 2003) (holding that it could be proven unreasonable, in executing a search warrant for tax offenses, to "grab [the suspect] by the arms, throw her to the ground, and twist her arms while handcuffing her").

In sum, Kimmel's effort to have the Court take the extraordinary step of dismissing a facially valid indictment based on the agents' routine conduct in arresting her pursuant to a lawful warrant is without merit and should be denied.

### C.    Kimmel's Deliberate Indifference Arguments Do Not Warrant Dismissal and Are Belied by Her Own Declination of Medical Assistance

Kimmel's contention that the indictment should be dismissed because the agents violated her substantive due process rights by exhibiting "utter disregard for her life-or-death medical situation" is similarly unprecedented.  ECF No. 1878 at 16.  Indeed, the government is unaware of a single federal criminal case in which a court dismissed an indictment for deliberately indifferent denial of medical care, and Kimmel cites none.  *See id.* at 16–20.  Her motion should be denied on that basis alone.

In any event, Kimmel's claim fails.  "Deliberate indifference requires (1) that the official[s] be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) that [they] draw that inference."  *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 74 (1st Cir. 2016).  As this Court has held, deliberate indifference requires "more than mere inadvertence or negligence;" "[r]ather . . . the officer [must be] aware of a substantial risk of serious harm which he intentionally disregarded."  *Turkowitz v. Town of Provincetown*, 914 F. Supp. 2d 62, 71 (D. Mass. 2012) (Gorton, J.).  But "[t]here is no deliberate indifference if an official responds reasonably to the risk."  *Miranda-Rivera*, 813 F.3d at 74.  And as this Court held in *Turkowitz*, if an arrestee declines an officer's offer to take her to the hospital or other medical assistance, such a declination is a "fatal defect[]" to a deliberate indifference claim.  *Turkowitz*, 914 F. Supp. 2d at 71; *see also LaFrenier v. Kinirey*, 478 F. Supp. 2d 126, 140 (D. Mass. 2007) (Saylor, J.), *aff'd*, 550 F.3d 166 (1st Cir. 2008) (finding, "under any view of the evidence," no

deliberate indifference where officers offered medical treatment that arrestee declined, and when arrestee's spouse requested ambulance, officers transported arrestee to hospital).

Here, Kimmel's deliberate indifference claim – propped up by hyperbolic descriptions of the agents' conduct as "cruel and unusual, deliberately indifferent, and undeniably reckless and unreasonable" – fails under any reasonable view of her arrest.  ECF No. 1878 at 19.  Most significantly, it is undisputed that the agents offered to call an ambulance as soon as Kimmel expressed health concerns and mere minutes after they arrived at her residence, but she declined. ECF No. 1879-1 at ¶ 17.  This concession alone is a "fatal defect[]" to her deliberate indifference claim.  *Turkowitz*, 914 F. Supp. 2d at 971.  Further, when the agents offered to call an ambulance, Kimmel's spouse advised them that her latest medical appointment had not given their family concern, that the "last time" they had called an ambulance for her "it turned out to be nothing," and that she simply needed to calm herself down.  Ex. A at 2.

Kimmel's motion seeks to downplay these facts, asserting instead more generically that "the arresting agents proceeded to deny her medical care as her symptoms worsened."  ECF No. 1878 at 20.  But nowhere in her affidavit will the Court find any factual assertion that Kimmel, at any time, requested medical care or changed her mind about declining the agents' offer to call an ambulance. ECF No. 1879-1 at ¶¶ 20–22.  Moreover, as soon as the MCC declined to process her, the agents transported Kimmel to the hospital, just as they had originally offered.  Ex. A at 3.  And they did so despite the request by Kimmel's husband that they "get her back downtown so she could be seen by a judge the same day." *Id.*  These facts do not remotely approach situations where courts in this District have concluded that deliberate indifference claims were potentially viable in a civil context (much less a criminal one).  *See, e.g.*, *Howe v. Town of N. Andover*, 854 F. Supp. 2d 131, 136–37, 140–41 (D. Mass. 2012) (Gorton, J.) (denying summary judgment on deliberate

indifference claim where officers beat an arrestee with a baton and placed him in a choke hold, dragged his unconscious body to a police car in handcuffs and leg shackles, and took him to the police barracks rather than a hospital, where he was pronounced dead by way of homicide).

>   **D.      Kimmel's Medical Circumstances Do Not Merit a Continuance, Much Less Dismissal**

The government is sensitive to Kimmel's medical circumstances.  Indeed, due to those circumstances, the government offered Kimmel a potential resolution of this case that would require no incarceration if she accepted responsibility for her crimes.  But Kimmel *rejected* that offer, and has elected instead to proceed to trial to tell "her side of the story" that she "believed [] she was making legitimate payments through Rick Singer to Georgetown and USC."  ECF No. 1878 at 1, 30.

That is her right.  But using her medical history as a shield against prosecution is not. Kimmel's request to dismiss the indictment pursuant to the Sixth Amendment due to her health conditions is unavailing.  "A court may end a prosecution only if there are legal grounds to do so. The poor state of a defendant's health, whether physical or mental, is not such a basis."  *United States v. Gunter*, 2013 WL 990437, at *1 (E.D. Pa. Mar. 13, 2013) (denying motion to dismiss by terminally ill defendant with bladder and prostate cancer, and collecting cases).  Despite ten pages of argument, Kimmel is unable to cite *a single case* in which a court entertained dismissal because a defendant was medically unfit for trial.  ECF No. 1878 at 21–30.

A continuance, not dismissal, is the remedy for a defendant medically incompetent to stand trial.  But in the First Circuit, even motions for continuances based on physical incompetence face a demanding standard: the trial must "pose a substantial danger to the defendant's life," and "[b]y contrast, the mere possibility of an adverse effect on a party's wellbeing is not enough to warrant a postponement."  *United States v. DeNunzio*, 174 F. Supp. 3d 582, 583–84 (D. Mass. 2016)

(Gorton, J.) (denying motion for continuance or severance by defendant suffering from cancer whose physician opined that he was not physically prepared to stand trial due to increased risk of infection from chemotherapy); *see also United States v. Zannino*, 895 F.2d 1, 14–15 (1st Cir. 1990) (affirming denial of motion for continuance by defendant who was hospitalized numerous times leading up to trial with congestive heart failure and multiple heart attacks even though court concluded that trial posed risk of him "sustaining another life threatening coronary incident").

Kimmel does not seek a continuance, and her medical status does not warrant it. Her own treating physician attests that "most people recover from Takotsubo." ECF No. 1879-2 at ¶ 6. "Most" is an understatement. According to scholarship Kimmel submits in support of her own motion, "[o]verall, the prognosis of Takotsubo cardiomyopathy is good. About 95% of patients recover full cardiac function within several weeks." ECF No. 1879-5 at 6. And her own expert cites scholarship finding only a 1.8% annual recurrence of Takotsubo events. ECF No. 1879-3 at ¶ 29; *see also* ECF No. 1879-25 at 3 ("Recurrence of [Takotsubo] is rare."). During the 27 months since her arrest, Kimmel has not suffered another Takotsubo event, has returned to exercising, and has been able to participate in her vigorous pre-trial defense. ECF No. 1879-1 at ¶¶ 33–38. At most, her expert opines that stressful events "could" trigger another Takotsubo episode, and that if such an event were to occur, it "could" be life-threatening. *Id.* ¶¶ 30, 32. That conjecture falls squarely within this Court's holding that the "mere possibility of an adverse effect on a party's wellbeing is not enough to warrant a postponement," let alone dismissal. *DeNunzio*, 174 F. Supp. 3d at 583.

Finally, Kimmel's argument that the government has somehow deprived her of the ability to testify in her own defense – based on the assertion that there is a "direct causal connection" between the government's "use of excessive force in arresting [her]" and her "current inability to

exercise her trial rights effectively" – is unavailing.  ECF No. 1878 at 29.  Kimmel had a heart condition, including a Takotsubo event, long before she was arrested (ECF No. 1879-1 at ¶¶ 6– 9), and the agents did not employ excessive force in arresting her.  Whether Kimmel is able to exercise her trial rights effectively remains to be seen.  But her ability to exercise them aggressively is plainly unimpaired.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Kimmel's motion should be denied.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney


By: <u>/s/ Ian Stearns</u>
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
KARIN M. BELL
STEPHEN E. FRANK
IAN STEARNS
Assistant United States Attorneys


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

<u>/s/ Ian Stearns</u>
Ian Stearns
Assistant United States Attorney