```
                    United States District Court
                      District of Massachusetts
 _____
                               )
United States of America,      )
                               )
        v.                     )
                               )
Gregory Colburn, et al.,       )
                               )   Criminal Action No.
        Defendants.            )   19-10080-NMG
                               )
                               )
                               )
 _____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

The government has charged defendant Elisabeth Kimmel ("Kimmel" or "defendant"), alongside multiple co-defendants, with conspiring with William "Rick" Singer ("Singer") to have her children fraudulently admitted into elite universities through the "side door" by, inter alia, falsifying their athletic credentials and bribing university employees and athletic coaches.

Specifically, the government contends that Kimmel paid a total of approximately $525,000 to secure admission for her daughter to Georgetown University, as a purported tennis recruit, and her son to the University of Southern California, as a purported track and field athlete, in violation of 18 U.S.C. §§ 371, 1349 & 1956(h). Pending before the Court is

-1-

Kimmel's motion to dismiss the indictment based on alleged constitutional violations. For the reasons that follow, that motion will be denied.

I. **Background**

The facts of this case have been extensively recited several times by this Court, see, e.g., Docket Nos. 1169 and 1334, but relevant here is the following:

On March 11, 2019, Chief Magistrate Judge Page Kelley authorized 32 arrest warrants based on a 536-paragraph criminal complaint charging dozens of parents allegedly engaged in Singer's college admission scheme with conspiracy to commit mail fraud and honest services fraud in violation of 18 U.S.C. § 1349. The next day, law enforcement officers executed those warrants, arresting all but a handful of defendants.

One of the arrestees was defendant Elisabeth Kimmel. Her apprehension was memorialized in a Federal Bureau of Investigations ("FBI") Form 302. As set forth therein, agents from the FBI and the Internal Revenue Service ("IRS") arrived at her residence just after 6:00 A.M. Several of the agents had their handguns unholstered. The agents knocked, announced their presence and that they had a warrant for Kimmel's arrest and waited for defendant at the front door. She remained upstairs, however, while her husband ("Mr. Kimmel") apprehensively answered the door.

Following several requests of the agents, Mrs. Kimmel eventually joined her husband downstairs and sat with the agents in the living room. The agents, who did not handcuff, restrain or otherwise touch Kimmel, informed her that they were there to arrest her in connection with the "university admission bribery scheme". Kimmel apparently became distressed in response to the news and informed the officers that her heart was "racing out of control". Mr. Kimmel reported that his wife had previously undergone heart surgery but noted that she was likely, then, just panicked. The agents subsequently offered to call an ambulance and take Kimmel to the hospital but she declined and apparently did not request medical attention any time thereafter.

After further discussion in the living room, one agent accompanied Mrs. Kimmel upstairs where she was permitted to brush her teeth, use the restroom and change her clothes before being transported to the Metropolitan Correctional Center ("the MCC") for processing. Defendant was unhandcuffed during that time and remained so until immediately before transport.

The agents and Kimmel arrived at MCC just after 7:00 A.M., before the facility was open for processing. They waited in the law enforcement vehicle and, as they did, the agents removed Kimmel's handcuffs from her back to her front, opened the car

windows and allowed Kimmel to lie down on the back seat after she alerted them that she was nauseated.

At about 8:20 A.M., agents escorted Kimmel into the MCC and allowed her to use the restroom. Shortly thereafter, the MCC staff informed the officers that Mrs. Kimmel could not be processed due to tightness in her chest and a pre-existing broken metatarsal in her foot. At that point, the agents transported Kimmel to the hospital.

On the way to the hospital, the officers called defendant's husband to inform him of the situation. During the conversation, Mr. Kimmel suggested that defendant was just reacting to the stress of the morning. He also requested that the agents shorten the hospital visit or bring defendant directly home, instead, out of concern that Kimmel would have to spend the night in the MCC if her initial appearance was delayed. The agents denied the request, stating a need to defer to the medical professionals.

Upon arrival at the hospital, FBI agents removed the handcuffs and updated Mr. Kimmel as to the situation while medical staff began performing tests on defendant. At 11:00 A.M., the hospital staff reported that there was some concern with respect to her medical tests, news of which the agents shared with Mr. Kimmel and they advised him to join his wife at

the hospital.  He arrived approximately 40 minutes later and sat with his wife and the agents in the emergency room.

Upon review of additional test results, a cardiologist recommended that Kimmel proceed with an angiogram for her heart which she chose to do after significant deliberation.  In the interim, a representative of the United States Attorney's Office and an FBI Supervisory Special Agent consulted with defendant's attorney and decided to release the defendant from FBI custody and permit her to self-report once her health improved.

Thereafter, Kimmel was transferred to another facility for specialized care.  She spent a total of five days in the hospital and was ultimately diagnosed with Takotsubo cardiomyopathy ("TC"), cardiogenic shock and severe aortic regurgitation.  Defendant submits that her condition, for which she blames the government, remains perilous.

Accordingly, defendant moves to dismiss the charges against her on the grounds that 1) her arrest was an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution ("the Fourth Amendment"), 2) her treatment immediately following her arrest, including the agents' deliberate indifference to her dire medical condition, was a deprivation of her substantive due process rights under the Fifth Amendment and 3) the consequences of both have compromised a fundamental liberty interest, namely, the right to direct her

defense and testify on her own behalf, as protected by the Fifth and Sixth Amendments.

## II. Motion to Dismiss

### A. Legal Standard

In contrast to civil actions, an indictment generally is not subject to dispositive motion practice. See United States v. Li, 206 F.3d 56, 62 (1st Cir. 2000) (quoting Stokes, 124 F.3d at 44) ("[D]ismissing an indictment is an extraordinary step."). The First Circuit Court of Appeals has observed that a federal court using its supervisory power to dismiss an indictment "directly encroaches upon the fundamental role of the grand jury." Whitehouse v. U.S. Dist. Ct. for Dist. of R.I., 53 F.3d 1349, 1360 (1st Cir. 1995). For that reason, such power is appropriately reserved for "extremely limited circumstances". Id. Indeed,

> [i]n the normal course of events, a facially valid indictment returned by a duly constituted grand jury calls for a trial on the merits.

United States v. Stokes, 124 F.3d 39, 44 (1st Cir. 1997).

### B. Application

#### 1. Unlawful Arrest

Even assuming, arguendo, that Kimmel's arrest constituted an unreasonable seizure in violation of the Fourth Amendment (which is highly implausible), she has not demonstrated that dismissing the indictment on that ground is warranted. As noted

by the government, defendant does not cite a single federal criminal case in which a court dismissed an indictment to remedy an unlawful arrest. Nor does she even cite the Fourth Amendment in support of her argument that dismissal is the "only appropriate remedy" in her case.

The reason for that omission is that the remedies available to a criminal defendant alleging a Fourth Amendment violation are limited to 1) suppression of evidence pursuant to the exclusionary rule and/or 2) a collateral civil rights lawsuit pursuant to 42 U.S.C. § 1983. See, e.g., Hudson v. Michigan, 547 U.S. 586, 591, 596-97 (2006) (noting that civil remedies are available for Fourth Amendment violations and the exclusionary rule (not dismissal) should be the court's "last resort"). Because the "remedy in a criminal proceeding is limited to denying the prosecution the fruits of its transgression", the circumstances of Kimmel's apprehension do not justify the dismissal of the indictment. See United States v. Morrison, 449 U.S. 361, 366 (1981) ("[The Supreme Court of the United States] ha[s] not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment.").

### 2. Denial of Medical Care

Kimmel further maintains that the federal agents violated her substantive due process rights by denying her adequate medical care. The government responds that Kimmel's claim

-7-

suffers from a fatal defect: federal agents offered to call an ambulance for Kimmel as soon as she expressed health concerns but she declined to accept their offer and apparently did not request medical attention at any time thereafter.

A law enforcement officer who fails to provide adequate medical treatment to an individual injured during apprehension violates the Fifth Amendment if such inattention constitutes deliberate indifference to serious medical needs. See Brace v. Massachusetts, 673 F. Supp. 2d 36, 40 (D. Mass. 2009). To constitute deliberate indifference, the medical care provided must be "so inadequate as to shock the conscience". Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (internal citation omitted). A medical need is "serious" if so diagnosed by a physician or if a lay person would easily recognize the need for urgent medical attention. Id. at 40-41 (citing Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990)).

Here, although the Court is sensitive to Kimmel's medical condition, nothing in the record supports the conclusion that the agents were deliberately indifferent as to her medical needs. When defendant informed the agents that her heart was racing, they offered to call an ambulance and transport her to a hospital but she declined. When she complained that she was nauseous, the agents opened the windows in their vehicle and permitted her to lie down. When MCC staff informed the agents

-8-

that Mrs. Kimmel could not be processed due to her physical state, the agents immediately transported her to the hospital even though Mr. Kimmel requested that she be taken home, instead. Finally, when it was decided that Kimmel would undergo an angiogram, the agents consulted with others and released her from FBI custody.

Absent from that series of events is any decision or conduct by the agents that shocks the conscience. Thus, the Court finds Kimmel's motion to dismiss the indictment for failure to provide adequate medical treatment unavailing.

### 3. Government Misconduct

Using hyperbolic language, Kimmel also seems to invoke the outrageous government misconduct doctrine to support dismissal. She contends that her arrest, which she describes as a "military-style assault on [her] home", directly caused her cardiac event. By allegedly causing such an episode, Kimmel submits that the government engaged in unconstitutional misconduct which requires the dismissal of the indictment.

The outrageous government misconduct doctrine allows a court, in the most extreme of circumstances, to dismiss a criminal indictment as a sanction for appalling government misconduct. See United States v. Guzman, 282 F.3d 56, 59 (1st Cir. 2002) (citing United States v. Russell, 411 U.S. 423, 431-32 (1973). To warrant such dismissal, the misconduct must be so

"egregious as to violate due process by shocking . . . the universal sense of justice". United States v. Therrien, 847 F.3d 9, 14 (1st Cir. 2017) (internal quotation marks omitted); see also Russell, 411 U.S. at 432 (noting that, for dismissal to be warranted, government misconduct must violate "fundamental fairness, shocking to the universal sense of justice").

Because "the law frowns on the exoneration of a defendant for reasons unrelated to his guilt or innocence", the government misconduct doctrine will be invoked sparingly and only in truly exceptional circumstances. Guzman, 282 F.3d at 59. Indeed, this Session is unaware of any situation in which the doctrine has been enforced in this Circuit, see United States v. Anzalone, 923 F.3d 1, 6 (1st Cir. 2019), and the circumstances described herein certainly do not warrant being the first.

First, the conduct of the arresting agents was not "appalling" but rather seemingly compliant with standard protocol. The agents acted pursuant to a valid arrest warrant and used no force other than placing Kimmel in handcuffs for transport. See United States v. McBride, No. 13-cv-10195, 2014 WL 2987014, at *4 (D. Mass. July 1, 2014) (finding no Fourth Amendment violation where officers executed a valid arrest warrant even though the criminal defendant posed no risk of flight); Calvi v. Knox County, 470 F.3d 422, 428 (1st Cir. 2006) (handcuffing a defendant in the customary manner and keeping her

-10-

in handcuffs for the purpose of transport is constitutionally reasonable). Kimmel was not apparently pushed, shoved or aggressively touched in any way during the course of her arrest. Furthermore, as detailed above, the officers took steps to avoid causing unnecessary discomfort during the arrest and transported Kimmel to the hospital once they learned of the seriousness of her condition.

Second, Kimmel's heart condition, of which the agents were previously unaware, pre-dates the subject arrest. Apparently, defendant first learned that she had a weakened area in the thoracic ascending aorta in 2007, she had open heart surgery in 2008 and she experienced her first TC event in 2017, more than one year prior to her arrest. Given that history, the accusation that the government's behavior caused her cardiac event is unwarranted. Because

> nothing about the officers' conduct was so clearly intolerable or so offensive to the universal sense of justice as to warrant jettisoning the charges[,]

Guzman, 282 F.3d at 59, the Court declines to dismiss the indictment pursuant to the outrageous government misconduct doctrine under these circumstances.

### 4. Right to Testify

Finally, defendant avers that her condition, on which she blames the government, remains dire and has left her with a "painful dilemma" of whether to exercise her Fifth and Sixth

-11-

Amendment right to testify in her own defense at grave risk to her health or decline to take the stand and risk conviction by a jury. Kimmel proclaims that the only way she can avoid that "untenable" choice is for this Court to dismiss her indictment.

The government responds that Kimmel is, in essence, arguing that she is medically incompetent to stand trial, the remedy for which is a continuance, not dismissal. It adds that defendant has failed to justify the postponement of her case because the medical evidence shows that most individuals recover from TC within a matter of weeks and, in any event, she has been able to participate in her "vigorous" pre-trial defense without any apparent problem.

It is uncontroverted that a criminal defendant has a constitutional right to testify in her own defense. See Rock v. Arkansas, 483 U.S. 44, 49 (1987). That right is protected by the Due Process Clause of the Fifth Amendment and the Compulsory Process Clause of the Sixth Amendment. Id. at 51.

The Due Process Clause also protects an accused person from conviction while she is deemed legally incompetent to stand trial. Johnson v. Norton, 259 F.3d 20, 26 (1st Cir. 2001). A criminal defendant is considered physically incompetent to stand trial if the trial will "pose a substantial danger to a defendant's life or health." United States v. Zannino, 895 F.2d 1, 14 (1st Cir. 1990). By contrast,

>     [t]he mere possibility of an adverse effect on a party's
>     wellbeing is not enough to warrant a postponement.

Id. In determining physical competency to stand trial, district courts must consider medical evidence, defendant's activities and the steps she is taking to improve her health, and whether the court can implement certain measures to reduce medical risk. Id.

Here, the Court agrees with the government that Kimmel has not demonstrated that postponement, let alone dismissal, of her trial is warranted at this time. See United States v. Gunter, No. 12-cv-394, 2013 WL 990437, at *1 (E.D. Pa. Mar. 13, 2013) ("The poor state of a defendant's health, whether physical or mental" is not a basis to dismiss an indictment.). Indeed, more than two years have elapsed since her hospitalization and Kimmel has suffered no other TC event, has returned to exercising and has exhibited a strong ability to participate in her vigorous pre-trial defense. Although the Court is sympathetic to defendant's medical condition, any risk to Kimmel's health posed by trial is speculative. In fact, Dr. Anthony David Litvak, an expert retained by defendant's counsel, cites scholarship reporting only a 1.8% annual recurrence of TC episodes. For those reasons, the Court will deny Kimmel's motion to dismiss, without prejudice.

**ORDER**

For the foregoing reasons, defendant Elisabeth Kimmel's motion to dismiss (Docket No. 1877) is **DENIED without prejudice. So ordered.**

<u>/s/ Nathaniel M. Gorton</u>
Nathaniel M. Gorton
United States District Judge

Dated June 25, 2021