UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No.: 19-10080-NMG |
| | ) |
| ELISABETH KIMMEL, | ) |
| | ) |
| | ) |
| Defendant | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government submits this memorandum in connection with the sentencing of defendant Elisabeth Kimmel. The parties have entered into a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), and, for the reasons set forth below, the government respectfully requests that the Court impose the agreed-upon disposition: a six-week term of imprisonment; a 24-month term of supervised release, including 12 months of home confinement and 500 hours of community service; and a $250,000 fine.

**I.     THE OFFENSE CONDUCT**

The Court is by now familiar with the facts of this case. *See generally* PSR ¶¶ 24–91. The defendant, a graduate of Stanford University and Harvard Law School, conspired with William "Rick" Singer and others over a seven-year period to commit mail and wire fraud by agreeing to falsely present her children as athletes so that they could be admitted to Georgetown University and the University of Southern California ("USC") as purported tennis and track-and-field recruits. *Id.* ¶ 44. As part of the scheme, Kimmel made payments totaling $525,000, styled as "donations," to Singer's sham charity, the Key Worldwide Foundation ("KWF"), in exchange for the fraudulent admission of her children as fake athletes. *Id.* ¶ 45.

A.     **The First "Side Door"**

The defendant's relationship with Singer began in 2011, when she hired him as a college counselor for her daughter, who was seeking to be recruited to college as a field-hockey player. *Id.* ¶ 46. When her daughter was not recruited by Georgetown for field hockey, however, the defendant arranged with Singer for her spouse (a former state prosecutor) and daughter to meet with the Georgetown tennis coach Gordon Ernst, even though the defendant's daughter was not a competitive tennis player. *Id.* ¶¶ 46, 49–50. Shortly after that meeting, Ernst presented the defendant's daughter to Georgetown's admissions department as a purported tennis recruit. *Id.* ¶ 51.

Following that meeting with Ernst, the Georgetown application for the defendant's daughter was submitted to the university's admissions office, electronically signed by the defendant as her daughter's guardian. *Id.* ¶ 53. That application stated that the defendant's daughter played tennis competitively 12 hours per week and 52 weeks per year, was a "ranked player" in Southern California, and was a four-year tennis academic All American. *Id.* None of that was true. *Id.* The defendant later told friends that Singer "filled out a lot of things on [her daughter's college applications] that were complete embellishments re activities and awards," and that "we had to go back and change everything." *Id.* ¶ 68.

Following the submission of the false application, the defendant asked Singer whether she should instruct her daughter to avoid discussing field hockey, the sport she actually played, during her Georgetown alumni admissions interview. *Id.* ¶ 54. The defendant expressed concern that discussing field hockey during the interview could "raise red flags" about her purported tennis recruitment. *Id.* In December 2012, Singer forwarded the defendant an e-mail from Ernst stating that her daughter had been granted conditional acceptance to Georgetown as a tennis recruit, and

2

the defendant later received a letter indicating that her daughter had been conditionally admitted "at the request of Mr. Gordie Ernst, tennis coach." *Id.* ¶ 56. The defendant later thanked Singer "for making Georgetown possible," and confirmed that "the amount was $275k over two payments," while other students in her daughter's high school class with higher GPAs and standardized test scores were denied admission to Georgetown. *Id.* ¶¶ 57, 60.

The defendant later caused her family's foundation—which established scholarships for families of law enforcement and military members, and which the defendant served as a director—to pay $275,000 to KWF, Singer's sham charity, while hiding the true purpose of the payments from the foundation and even her own father. *Id.* ¶¶ 58, 63–67, 150. In forwarding the bogus charitable receipt letter from KWF to her spouse, the defendant wrote: "I wonder if [the bookkeeper for her family foundation] will authorize payment based on this letter. I hope she doesn't decide to make a big deal about it and run it by my dad." *Id.* ¶ 59.

B.     **The Second "Side Door"**

In 2017, the defendant told her spouse that her son's prospects for admission on his own to USC—his "dream school"—"d[idn't] sound encouraging." *Id.* ¶¶ 70–71. Accordingly, in August 2017, she agreed to pay $250,000 for Singer to secure her son's admission to USC as a recruited pole vaulter, even though he did not participate in track and field. *Id.* ¶ 69. In October 2017, corrupt USC senior women's athletics administrator Donna Heinel presented the defendant's son as a pole vaulter to USC's subcommittee on athletic admissions, using a fake athletic profile containing a pole vaulter's photograph copied from the internet. *Id.* ¶¶ 72–75. Heinel fooled USC's admissions department, and Singer then sent the defendant her son's conditional acceptance letter, which indicated that he had "the potential to make a significant contribution in the intercollegiate athletic program." *Id.* ¶¶ 76–77. The defendant asked Singer about the letter's

reference to registering with the NCAA, to which Singer responded: "[W]e did the same for [your daughter] too." *Id.* ¶ 77.

The defendant was not a passive participant in the scheme. For example, when she later noticed that track and field was not included on her son's formal USC application, she specifically directed Singer to add that sport, which her son did not play. *Id.* ¶ 80. She then directed Singer's associate to remove the fraudulent athletic credentials from her son's applications to other colleges. *Id.* ¶ 81. Likewise, the defendant and her spouse discussed how to hide from their son that he was admitted to USC as a recruited athlete. *Id.* ¶ 84. She and Singer's associate discussed how to obtain her son's high school transcript for NCAA registration without "rais[ing] questions" with his high school counselor. *Id.* ¶ 85. And the defendant, her spouse, and Singer also discussed how to conceal the fraud from her son's advisor at USC, who had inquired about her son's participation on the track team. *Id.* ¶ 86. Indeed, months before the government even approached Singer, the defendant and her spouse were intercepted on the Court-authorized wiretap, with the defendant worrying that the advisor would "start poking around," and adding, "I would just hate for him to lose his spot." *Id.* ¶¶ 86–87. During the same call, she and her spouse directed Singer to have Heinel remove their son from the track-and-field notification "list" in order to avoid further inquiry. *Id.* ¶ 87. Singer promptly followed-up with Heinel, and forwarded the defendant an e-mail in which Heinel promised to "take care of [it] tmw." *Id.* ¶ 88.

As with her daughter's admission to Georgetown, the defendant's payments followed the fraud that secured her son's admission to USC. In late 2017 and early 2018, the defendant caused her family's foundation to make a $50,000 payment to the USC Women's Athletics Board and a $200,000 payment to KWF. *Id.* ¶¶ 79, 82–83.

4

Acting at the direction of law enforcement in January 2019, Singer told the defendant during a consensually recorded phone call that she might be contacted by USC's admissions department about why her son did not attend track-and-field practice. *Id.* ¶ 90. During that call, the defendant agreed to lie to USC's admissions department about a fake injury. *Id.* The defendant subsequently called Singer back to make sure that the admissions department would not contact her son, laughing as she noted that he was "still in the dark." *Id.* ¶ 91.

## II. SENTENCING RECOMMENDATION

Despite her compelling personal medical circumstances, the seriousness of the defendant's crime and her deep involvement in the scheme justify a sentence of incarceration. *See* 18 U.S.C. § 3553(a)(1), (2)(A). Twice, the defendant agreed to pay money in exchange for having Singer secure her children's admission to elite universities as purported athletic recruits in sports they did not play. Kimmel's counsel—in a one-paragraph summary of the offense—states that Kimmel "did not know all of the details" of the fraud, simply "went along with Singer's fraudulent plan," and "allowed herself to be taken in by Singer." Dkt. 2451 at 8.[1]

But at every step of the way—over the course of more than half a decade—the defendant was intimately involved in the details of the fraud, and agreed to peddle even more lies to avoid getting caught.

---

[1] The defendant's sentencing memorandum, and the 37 letters submitted by family and friends in support of it, portray her as a "humble," "honest" person who "has strived to live a life of integrity in all that she does." Dkt. 2451 at 2. Days after her arrest in this case, a teacher at her children's high school, unprompted, sent her the following e-mail: "Attached is the college letter of recommendation I wrote for [your daughter] six years ago. Without a single reservation, I believed in her qualifications—her powerful intellect, her uncompromising sportsmanship, her sterling character—when you did not. Many of the faculty at Bishop's—I could list ten off the top of my head—remember you as boorish, your treatment of us demeaning, insulting, unprincipled. But we loved your children and, in spite of their parents, always had their best interests at heart. To that end, please forward my letter to [your daughter]." Ex. A.

- Reflecting her insight into the scheme, the defendant arranged a face-to-face meeting among her spouse, daughter, and Ernst, and she received e-mails from Heinel that Singer forwarded to her.

- Demonstrating her level of participation in the scheme, the defendant directed Singer to add track and field to her son's USC application, and to remove it from his non-USC applications. She later instructed Singer to have Heinel take her son off the track-and-field list.

- Underscoring her willingness to lie to ensure the scheme's success, the defendant discussed having her daughter lie during her Georgetown admissions interview to avoid raising "red flags," and later told her spouse she worried that the bookkeeper for her family's foundation would make a "big deal" about the payments to Singer's sham charity. She sought to evade detection by her son's high school counselor and his USC faculty advisor. And she later agreed to lie to USC's admissions department about a fake injury and laughed about keeping her son ignorant about the basis for his college admission.

The defendant's history and characteristics underscore the callous nature of her conduct. *See* 18 U.S.C. § 3553(a)(1). Despite a privileged upbringing, a net worth totaling hundreds of millions of dollars, and degrees from two of the most prestigious academic institutions in the world—including a law degree—the defendant chose repeatedly to break the law, and to buy her children opportunities they did not deserve. She knew better; but she chose, again and again, to cheat and lie.

At the same time, the government acknowledges the severity of the defendant's medical issues. *See* PSR ¶¶ 132–39. In light of those issues, the government submits that the agreed-upon disposition—which includes six weeks of incarceration and 12 months of home confinement in lieu of additional incarceration, as well as 500 hours of community service—is sufficient to provide just punishment, promote respect for the law, and deter this defendant and others, while also accounting for the risks to the defendant's health and her need for medical care. *See* 18 U.S.C. § 3553(a)(2)(D).

Finally, the agreed-upon disposition reflects the statutory interest of imposing comparable sentences for similarly-situated defendants. As examples:

- Defendant Jeffrey Bizzack was sentenced to two months in prison, three years of supervised release including 300 hours of community service per year and no home confinement, and a $250,000 fine in connection with agreeing to pay $250,000 to secure his son's admission to USC as a fake volleyball player. PSR ¶ 17. He engaged in the scheme only once, and did not have serious medical issues.

- Defendant Lori Loughlin was sentenced to two months in prison, two years of supervised release including 100 hours of community service and no home confinement, and a $150,000 fine. PSR ¶ 7. Like Kimmel, she participated in the scheme twice, but did not have serious medical issues.

- Defendant Marci Palatella, although she has not yet been sentenced, has agreed to a Rule 11(c)(1)(C) plea agreement with a sentence of six weeks in prison, two years of supervised release including 500 hours of community service and six months of home confinement, and a $250,000 fine. PSR ¶ 7. Like Kimmel, Palatella participated in the scheme twice—once to secure her son's admission to USC as a fake football recruit and once to cheat on his standardized college entrance exam—and her agreed-upon sentence also takes into account familial medical considerations under 18 U.S.C. § 3553(a)(2)(D).

- Defendant Peter Dameris was sentenced to time-served (one day in custody), three years of supervised release including 12 months of home confinement, and a $95,000 fine in connection with his payment of $300,000 to KWF for Ernst to recruit his son to Georgetown, even though he did not play tennis competitively. PSR ¶ 21. Unlike Kimmel, Dameris immediately accepted responsibility for his conduct and participated in the scheme only once. Similar to Kimmel, however, his sentencing accounted for medical considerations involving close family members under 18 U.S.C. § 3553(a)(2)(D).

This Court has imposed a sentence requiring as many as 500 hours of community service for only one other defendant in this case,[2] and 12 months is the longest period of home confinement for any defendant who has also been sentenced to prison in this case or related cases.[3] Accordingly, the government submits that these aspects of the proposed disposition, when combined with the term of incarceration, contribute to a sentence that, as a whole, appropriately balances the considerations set forth in Section 3553(a).

---

[2] *See* PSR ¶ 7 (*United States v. Hodge*, 19-cr-10080-NMG-11 (500 hours of community service)).

[3] *See* PSR ¶ 11 (*United States v. Vandemoer*, 19-cr-10079-RWZ (one day time-served of incarceration and six months of home confinement)); PSR ¶ 12 (*United States v. Fox*, 19-cr-10081-IT-7 (three months of incarceration and three months of home confinement)); PSR ¶ 21 (*United States v. Dameris*, 20-cr-10099-RGS (one day time-served incarceration and 12 months home confinement)).

## III. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court accept the defendant's Rule 11(c)(1)(C) guilty plea and impose the agreed-upon sentence: six weeks of incarceration; 24 months of supervised release, with conditions of home confinement for the first 12 months of supervised release and 500 hours of community service; and a statutory-maximum fine of $250,000.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: */s/ Ian J. Stearns*
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Ian J. Stearns*
IAN J. STEARNS
Assistant United States Attorney