UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| ELISABETH KIMMEL, | ) | Civil No.: 24-cv-10297-NMG |
| | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANT'S
MOTIONS TO VACATE PURSUANT TO SECTION 2255 AND FOR RECUSAL**

# **TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT……………………………………………………1

II.     BACKGROUND…………………………………………………………………….3

     A.      Factual Background…………………………………………………………….3

          1.      The Georgetown Admission Slot the Defendant Fraudulently Obtained for Her Daughter as a Fake Tennis Player in Exchange for $275,000……3

          2.      The USC Admission Slot the Defendant Fraudulently Obtained for Her Son as a Fake Pole Vaulter in Exchange for $250,000……………………6

     B.      Procedural Background………………………………………………………..10

          1.      The Indictment and the Defendant's Motion to Dismiss Count One…….10

          2.      The Defendant's Plea Agreement, Guilty Plea, and Sentencing ………..13

III.    LEGAL STANDARD………………………………………………………………17

IV.     ARGUMENT………………………………………………………………………17

     A.      *Ciminelli* Has No Bearing on the Defendant's Conviction for Property Fraud……………………………………………………………...…18

     B.      The Appeal and Collateral Attack Waiver that the Defendant Agreed to in Her Plea Agreement Forecloses Her Motion……………………………….23

     C.      The One-Year Statute of Limitations Bars the Defendant's Motion…………..28

     D.      The Defendant's Motion Cannot Overcome Her Procedural Default…………..29

     E.      The Defendant's Motion for Recusal Is Meritless………………………………32

          1.      Applicable Law………………………………………………………….32

          2.      The Defendant's Recusal Motion Should Be Denied……………………35

V.      CONCLUSION…………………………………………………………………...39

## TABLE OF AUTHORITIES

### CASES

*Baldyga v. United States*, 337 F. Supp. 2d 264 (D. Mass. 2004)…………………….……….34

*Berthoff v. United States*, 308 F.3d 124 (1st Cir. 2002)……………………………………29

*Bousley v. United States*, 523 U.S. 614 (1998)…………………………………………..3, 31

*Ciminelli v. United States*, 598 U.S. 306 (2023)……………………………………*passim*

*Clemente v. United States*, 42 F.3d 1384 (1st Cir. 1994)…………………………………...34

*Cook v. United States*, 84 F.4th 118 (2d Cir. 2023)…………………………………….…...23

*Damon v. United States*, 732 F.3d 1 (1st Cir. 2013)……………………………………30, 31

*David v. United States*, 134 F.3d 470 (1st Cir. 1998)……………………………………17

*Derman v. United States*, 298 F.3d 34 (1st Cir. 2002)……………………………………31

*Dimott v. United States*, 881 F.3d 232 (1st Cir. 2018)……………………………………...29

*Dubose v. United States*, 2011 WL 4498993 (D. Mass. Sept. 23, 2011)………………….…...17

*Dunn v. United States*, 2024 WL 665091 (D. Mass. Feb. 16, 2024)……………………………...3

*Fenton v. United States*, 914 F. Supp. 2d 79 (D. Mass. 2012)……………………………39

*Ferguson v. United States*, 2018 WL 443444 (D. Mass. Jan. 16, 2018)………………………...31

*In re United States*, 666 F.2d 690 (1st Cir. 1981)……………………………………33

*In re United States*, 441 F.3d 44 (1st Cir. 2006)…………………………………………32, 35

*Liteky v. United States*, 510 U.S. 540 (1994)……………………………………33

*Moreno-Morales v. United States*, 334 F.3d 140 (1st Cir. 2003)……………………………..39

*Murray v. United States*, 2011 WL 1478949 (D. Mass. Mar. 15, 2011)………………………...34

*Portis v. United States*, 33 F.4th 331 (6th Cir. 2022)……………………………………23

*Portway v. United States*, 105 F. Supp. 3d 127 (D. Mass. 2015)……………………………30

*Reed v. Ross*, 468 U.S. 1 (1984)……………………………………30

ii

*Singleton v. United States*, 26 F.3d 233 (1st Cir. 1994)……………………………………..…17

*Smoak v. United States*, 12 F. Supp. 3d 254 (D. Mass. 2014)………………………………...28

*Sotirion v. United States*, 617 F.3d 27 (1st Cir. 2010)…………………………………...23, 25, 26

*Teixeira v. United States*, 2024 WL 185387 (D. Mass. Jan. 17, 2024)………………………17

*Thongseng v. United States*, 2009 WL 3678678 (D. Mass. Oct. 28, 2009)………………….…..29

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023)………………………………2, 10, 18, 22, 36

*United States v. Acevedo*, 2019 WL 3003904 (D. Mass. July 9, 2019)………………….…...17, 30

*United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011)………………………………...13

*United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007)………………………………………………13

*United States v. Chan*, 2022 WL 952186 (D. Mass. Mar. 30, 2022)……………………………33

*United States v. Chan*, 2022 WL 17722544 (D. Mass. Dec. 15, 2022)..................................33, 39

*United States v. Ciampi*, 419 F.3d 20 (1st Cir. 2005)……………………………23, 24, 25, 26, 28

*United States v. Colburn*, 19-cr-10080-NMG................................................................................27

*United States v. Craig*, 357 F. Supp. 3d 87 (D. Mass. 2019)……….…………………23, 24, 26

*United States v. DeFronzo*, 281 F. Supp. 3d 243 (D. Mass. 2017)..…………………23, 24, 25, 26

*United States v. Ernst*, No. 19-CR-10081-IT……………………………………………….....4

*United States v. Frady*, 456 U.S. 152 (1982)……………………………………………………30

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997)……………………………………………11

*United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023)…………………………...……………18

*United States v. Hand*, 2023 WL 8283722 (D. Mass. Nov. 30, 2023)………………………29, 20

*United States v. Iacaboni*, 52 F. Supp. 3d 365 (D. Mass. 2014)………………………………34

*United States v. Kousisis*, 82 F.4th 230 (3d Cir. 2023)…………………………………………18

*United States v. Lara-Joglar*, 400 F. App'x 565 (1st Cir. 2010)………………………………...27

*United States v. Martorano*, 620 F.2d 912 (1st Cir. 1980)………………………………………38

*United States v. Mavroules*, 798 F. Supp. 61 (D. Mass. 1992)…………………………37, 38, 39

*United States v. McForbes*, 480 F. Supp. 3d 300 (D. Mass. 2020)……………………………...31

*United States v. McGill*, 11 F.3d 223 (1st Cir. 1993)……………………………………………39

*United States v. McGlashan*, 78 F.4th 1 (1st Cir. 2023)…………………………………………27

*United States v. McGlashan*, 19-cr-10080-NMG…………………………………………………27

*United States v. Miller*, 2023 WL 7346276 (N.D. Cal. Nov. 6, 2023)…………………………..18

*United States v. Murphy*, 836 F.2d 284 (6th Cir. 1988)…………………………………………11

*United States v. Porat*, 76 F.4th 213 (3d Cir. 2023)……………………………………………18

*United States v. Sampson*, 148 F. Supp. 3d 75 (D. Mass. 2015)………………………………...38

*United States v. Santiago Miranda*, 654 F.3d 130 (1st Cir. 2011)……………………………28

*United States v. Scott*, 450 F. Supp. 3d 82 (D. Mass. 2020)……………………………………33

*United States v. Shih*, 73 F.4th 1077 (9th Cir. 2023)……………………………………………18

*United States v. Sidoo*, 468 F. Supp. 3d 428 (D. Mass. 2020)………………………………12, 13

*United States v. Stonier*, 2011 WL 666265 (D. Mass. Feb. 14, 2011)…………………………...34

*United States v. Teeter*, 257 F.3d 14 (1st Cir. 2001)………………………………24, 25, 28

*United States v. Vazquez Gatica*, 2023 WL 7017084 (7th Cir. Oct. 25, 2023)…………………27

## STATUTES, RULES, AND OTHER AUTHORITIES

18 U.S.C. § 666………………………………………………………………………..10, 14, 16, 26, 32

18 U.S.C. § 1341…………………………………………………………………………………*passim*

18 U.S.C. § 1343…………………………………………………………………………………*passim*

18 U.S.C. § 1349…………………………………………………………………………………*passim*

28 U.S.C. § 2255…………………………………………………………………………………*passim*

Fed. R. Crim. P. 11(c)(1)(C)……………………………………………………………………13

U.S.S.G. §§ 2C1.1(a)(2), (b)(1), and (b)(2)……………………………………………………...14

D. Mass. Local Rule 40.1(k)……………………………………………………………………36

The government respectfully submits this consolidated opposition to defendant Elisabeth Kimmel's motion under 28 U.S.C. § 2255 to vacate her conviction and sentence (Dkt. 2749) and her motion for recusal of the assigned District Judge from considering that motion (Dkt. 2755).

## I.   <u>PRELIMINARY STATEMENT</u>

In July 2018, the defendant was intercepted on a Court-authorized wiretap discussing with William "Rick" Singer the fact that, in exchange for $250,000, they had obtained an admission slot from the University of Southern California ("USC") for the defendant's son based on fraud: that he was a recruited athlete in a sport he did not actually play. The defendant worried that her son's advisor would start "poking around" and that USC would discover that the slot had been obtained based on a lie: "I would just hate for him to lose his spot," she said.

That wiretap call was a sliver of the evidence against the defendant, who had engaged in the same scheme years earlier to obtain an admission slot from Georgetown University for her daughter as a fake tennis recruit, in exchange for $275,000, most of which went to the pocket of Georgetown's tennis coach. That evidence caused the defendant to approach the government one month before her trial and seek a plea agreement. Shortly thereafter, the defendant waived her right to appeal or collaterally attack her conviction and pleaded guilty to Count One of the indictment, which charged her with conspiring to commit mail and wire fraud by scheming to defraud Georgetown and USC of "property, to wit . . . admission to the Universities." As part of her plea agreement, the defendant obtained considerable benefits, including an agreed-upon prison sentence of just six weeks and the dismissal of charges that carried significantly harsher penalties. During her Rule 11 hearing, the defendant was apprised of her plea agreement's collateral attack waiver, pleaded guilty to conspiracy to commit mail and wire fraud "to obtain property," and

admitted that "admission slots" were "assets of the universities" she defrauded. The Court imposed the agreed-upon sentence, and the defendant did not appeal.

Now, more than two years after her judgment became final, the defendant has moved to collaterally attack her conviction and sentence under 28 U.S.C. § 2255. The sole basis for her motion is that the Supreme Court's decision last year in *Ciminelli v. United States*, 598 U.S. 306 (2023), overturned the "right-to-control" theory of property fraud, one of two alternative theories of property fraud in this case.

The defendant's motion should be denied for multiple independent reasons: it is barred by her plea agreement's collateral attack waiver; it is time-barred; and it is procedurally defaulted. It is also utterly without merit, built on an Alice-in-Wonderland version of events in which the defendant's extensive pre-trial litigation challenging the government's traditional property fraud theory, *and* this Court's decision affirming that theory and the alternative right-to-control theory, *and* the defendant's subsequent plea to a property fraud charge, *and* the First Circuit's decision in *United States v. Abdelaziz* rejecting the argument that "property-based convictions under these statutes must be reversed . . . because 'admissions slots' cannot be property" under the traditional theory of property fraud, all did not occur. The indisputable reality is this: the defendant—a Harvard-educated former lawyer represented by experienced counsel—was charged with traditional property fraud in an indictment alleging that admission slots are property. She knowingly and voluntarily pleaded guilty to that crime. And *Ciminelli*—by its own holding—has no bearing on that conviction.

Doubling down, and because the defendant's § 2255 motion is substantively and procedurally frivolous, she has resorted to forum-shopping by moving, two weeks after filing it, to recuse the assigned District Judge. The defendant's effort to have the Court recuse itself from

considering a routine § 2255 motion filed in the wake of a guilty plea is as meritless as her underlying motion, and contrary to the applicable standard, which presumptively *disfavors* recusal in § 2255 matters.  Both her motions should be denied.

## II.   BACKGROUND

### A.   Factual Background[1]

From in or about 2012 to 2019, the defendant—a now-disbarred lawyer who graduated from Stanford University and Harvard Law School—conspired with Singer, Gordon Ernst, Steven Masera, Mikaela Sanford, Laura Janke, Donna Heinel, and others[2] to falsely present her children as recruited athletes in sports that they did not play, in exchange for money, so that they could obtain admission to Georgetown and USC using admission slots reserved for recruited athletes. PSR ¶ 44.  The object of the scheme was to deprive the universities of property in the form of admission slots.  *See, e.g.*, *id.* ¶¶ 38–42.  As part of the scheme, Kimmel made payments totaling $525,000, styled as "donations," to Singer's sham charity, the Key Worldwide Foundation ("KWF"), in exchange for the fraudulent admission of her children as fake athletes.  *Id.* ¶ 45.

### 1.   The Georgetown Admission Slot the Defendant Fraudulently Obtained for Her Daughter as a Fake Tennis Player in Exchange for $275,000

The defendant's relationship with Singer began in 2011, when she hired him as a college counselor for her daughter, who was seeking to be recruited to college as a field-hockey player.

---

[1] Because the defendant's conviction resulted from a guilty plea, the following facts are principally drawn from the pre-sentence report ("PSR"), unless otherwise noted.  *See Dunn v. United States*, 2024 WL 665091, at *1 (D. Mass. Feb. 16, 2024) (Saylor, J.) (denying § 2255 motion); *see also Bousley v. United States*, 523 U.S. 614 (1998) (noting that government is "permitted to present any admissible evidence of petitioner's guilt" on a § 2255 motion).

[2] Singer pleaded guilty and was sentenced to 42 months in prison.  Ernst pleaded guilty and was sentenced to 30 months in prison.  Heinel pleaded guilty and was sentenced to six months in prison.  Masera, Sanford, and Janke all pleaded guilty and cooperated in the government's investigation, and they were sentenced to time-served.

*Id.* ¶ 46.  But when her daughter was not recruited by Georgetown or other Division I colleges for field hockey, Singer presented his "Georgetown option" to the defendant: paying money in exchange for the agreement of Georgetown's tennis coach Ernst to falsely present the defendant's daughter to the university's admissions department as a purported tennis recruit.  *Id.* ¶¶ 41–42, 49. The defendant agreed and arranged with Singer for her spouse and daughter to meet with Ernst. *Id.*  ¶¶ 46, 49–50.   Shortly after that meeting, Ernst presented the defendant's daughter to admissions, using one of the six admission slots allotted to him for tennis recruits.  *Id.* ¶ 51.[3]

Following that meeting with Ernst and his submission of the defendant's daughter to admissions as a tennis recruit, the defendant signed as guardian for her daughter's Georgetown application, which was submitted to the university's admissions department.  *Id.* ¶ 53.  That application falsely stated that the defendant's daughter played tennis competitively 12 hours per week and 52 weeks per year, was a "ranked player" in Southern California, and was a four-year tennis academic All American.  *Id.*  The fraudulent application also stated that tennis was her most important extracurricular activity, and an essay accompanying the application falsely stated that the defendant's daughter was looking forward to "focusing solely on one sport [tennis] in college." *Id.*

None of that was true.  As the defendant knew, her daughter was not a competitive tennis player, much less a player capable of competing on Georgetown's Division I tennis team.  *Id.* ¶ 46. Indeed, she did not even play on her high school's tennis team.  *Id.*

---

[3] The admissions office at Georgetown allotted a set number of admission slots to each head coach of a sport for that coach's recruited athletes.  PSR ¶ 39.  Ernst was allotted six slots each year.  *United States v. Ernst*, No. 19-CR-10081-IT, Oct. 25, 2021 Plea Tr. at 27 (noting that "Georgetown allotted Mr. Ernst six recruitment spots per year to use to recruit legitimate tennis players").

Following the submission of the fraudulent application, the defendant asked Singer in an e-mail whether she should instruct her daughter to lie during her Georgetown alumni admissions interview and avoid discussing field hockey—the sport she actually played. *Id.* ¶ 54. The defendant expressed concern to Singer that revealing the truth and discussing field hockey during the interview could "raise red flags" about her daughter's purported tennis recruitment. *Id.*

In December 2012, Singer forwarded the defendant an e-mail from Ernst stating that her daughter had been granted conditional acceptance to Georgetown as a tennis recruit, and the defendant later received a letter indicating that Georgetown had conditionally granted her admission "at the request of Mr. Gordie Ernst, tennis coach." *Id.* ¶ 56. The defendant thanked Singer "for making Georgetown possible" for her daughter and confirmed that "the amount was $275k over two payments." *Id.* ¶ 57. Absent the defendant's fraud that caused Georgetown to grant her daughter admission as a tennis recruit using one of Ernst's six allotted slots, her daughter would not have obtained admission to Georgetown; indeed, Georgetown denied admission to several other students in the same high school who had both higher GPAs and standardized test scores. *Id.* ¶¶ 57, 60. But as Singer reassured the defendant—after she expressed concern that her daughter had received a D-minus grade on a high school exam—academic qualifications were less important for her because they were paying to have Ernst corruptly designate her daughter as a fake recruit: "side door not as important." *Id.* ¶ 52.

Upon her daughter's Georgetown admission, the defendant caused her family's foundation—which established scholarships for families of law enforcement and military members, and which the defendant served as a director—to pay $275,000 to KWF, Singer's sham charity. *Id.* ¶¶ 58, 63–67, 150. The defendant concealed the true purpose of the payments from her foundation and even her own father. *Id.* In forwarding the fake charitable receipt letter from

5

KWF to her spouse, the defendant wrote: "I wonder if [the bookkeeper for her family foundation] will authorize payment based on this letter.  I hope she doesn't decide to make a big deal about it and run it by my dad."  *Id.* ¶ 59.  The fraudulent receipt letter, which the defendant received from KWF employee Steven Masera, falsely stated that no goods or services were exchanged for the payment.  *Id.* ¶ 63.

Of the $275,000 the defendant paid to KWF, Singer funneled approximately $150,000 in monthly bribes to Ernst's pocket in exchange for his role in defrauding Georgetown of one of its admission slots.  *Id.* ¶ 67.  As Singer wrote to Masera in directing him to make the payments: "we will have 150 that goes to Gordie from . . . Kimmel's."  *Id.* ¶ 62.

### 2. The USC Admission Slot the Defendant Fraudulently Obtained for Her Son as a Fake Pole Vaulter in Exchange for $250,000

In 2017, the defendant told her spouse that her son's prospects for admission to USC—his "dream school"—"d[idn't] sound encouraging."  *Id.* ¶¶ 70–71.  Accordingly, in August 2017, the defendant agreed to pay $250,000 for Singer to obtain admission for her son to USC as a recruited pole vaulter, even though he was not a pole vaulter and did not even participate in track and field. *Id.* ¶ 69.  As with her daughter, the defendant knew that absent the fraud, USC would not have given her son an admission slot—a fact that USC's assistant dean of admissions confirmed during the trial of two related defendants:

```
16   Q.   So would this student, ███    Kimmel, have been
17   competitive academically with other applicants at USC outside
18   of the athletic recruitment process?
19   A.   He would not have been terribly competitive academically.
20   We see much stronger applicants from his high school every
21   year.
```

19-cr-10080-NMG, 9/21/2021 Trial Tr. at 176.

The defendant and her spouse met with Singer on August 8, 2017, and the next day, Singer sent himself a list of side-door families with the subject "USC with Donna [Heinel]"—included on the list was the name of the defendant's son and $250,000.  PSR ¶ 71.  Later that fall, Heinel presented the defendant's son as a pole vaulter at a meeting of USC's subcommittee on athletic admissions, using a fake pole-vaulting profile that Janke created as part of the scheme, which included a photograph of a pole vaulter who was not the defendant's son, and numerous fake credentials:



*Id.* ¶¶ 72–75.

USC's assistant dean of admissions—who attended the subcommittee meeting—voted to grant the defendant's son an admission slot because she believed the false representation that he was a legitimate Division I pole vaulting recruit for USC's team—which has won more than 25 NCAA Division I championships—and that the photo was actually him:

```
22    Q.   At the bottom, are those your initials?

23    A.   Yes, RJC.

24    Q.   Why did you vote to approve this applicant for admission

25    to USC?
```

175

```
1     A.   Based on the information that had been presented, we

2     believe that he would contribute athletically to the

3     university.
```

19-cr-10080-NMG, 9/21/2021 Trial Tr. at 176–77.

Having thus defrauded the USC admissions department at the defendant's behest, Singer sent the defendant a conditional acceptance letter indicating that USC's admissions officers had voted to grant her son admission because they believed he had "the potential to make a significant contribution in the intercollegiate athletic program."  PSR ¶¶ 76–77.  The defendant asked Singer about the letter's reference to registering with the NCAA, to which Singer responded: "[W]e did the same for [your daughter] too."  *Id.* ¶ 77.

With the admission slot for her son secured, the defendant caused her family's foundation to make a *quid pro quo* payment of $50,000 to the USC Women's Athletics Board controlled by Heinel and a $200,000 payment to KWF.  *Id.* ¶¶ 79, 82–83.

As with her daughter's fraudulent admission to Georgetown, the defendant was actively involved not merely in securing her son's fraudulent USC admission, but also in concealing her fraud.  For example, when she noticed that track and field was not included on her son's formal

USC application, the defendant directed Singer to add that sport, which her son did not play.  *Id.* ¶ 80.  She likewise directed Singer's associate Sanford to remove the fake athletic credentials from her son's applications to other colleges.  *Id.* ¶ 81.  The defendant and Sanford also discussed how to hide her son's fake recruitment from his high school, because, as the defendant noted, she was "concerned that asking [my son's high school] counselor to submit his transcript to the NCAA will raise questions, particularly since [his] counselor knows him well and is familiar with all of his activities/extracurriculars."  *Id.* ¶ 85.

The defendant, her spouse, and Singer also discussed how to conceal the fraud from her son's USC advisor because they knew that he would lose his admission slot if the scheme was uncovered.  *Id.* ¶ 86.  In a call with Singer that, unbeknownst to any of the participants, was intercepted on a Court-authorized wiretap, the defendant worried that the USC advisor—who had inquired about her son's participation on the track team—would "start poking around" and find out he was not actually a track-and-field recruit: "I would just hate for him to lose his spot."  *Id.* ¶¶ 86–87.  The defendant and her spouse directed Singer to have the corrupt insider Heinel remove their son from the track-and-field notification "list" to forestall further inquiry.  *Id.* ¶ 87.  Singer promptly followed-up with Heinel, and forwarded the defendant an e-mail in which Heinel promised to "take care of [it] tmw."  *Id.* ¶ 88.

Months later, after Singer began cooperating with the government's investigation, he told the defendant during a consensually recorded phone call that USC's admissions department might contact her about why her son did not attend track-and-field practice.  During that call—with the defendant in Cambridge, where she was attending a meeting of the board of the Harvard Law School Alumni Association—they discussed a plan for the defendant to lie to USC's admissions department by pretending that her son had suffered an injury:

| Singer: | So what I wanted you to know is that you may get a phone call from admissions, just asking why [your son] didn't show up for practice, which I don't believe will happen, because he's not on anybody's list…but I wanted you to be aware. |
| --- | --- |
| Kimmel: | So what do you recommend I say? |
| Singer: | I would say that if they do ask you, which I doubt they will, that [your son] had an injury over the summer, to his shoulder, and so he stopped vaulting. |
| Kimmel: | Mmm.  Okay. |

*Id.* ¶ 90.  The defendant later called Singer back to make sure that admissions would not contact her son directly, laughing as she noted that he was "still in the dark" about the fraud.  *Id.* ¶ 91.

### B.   Procedural Background

#### 1.   The Indictment and the Defendant's Motion to Dismiss Count One

In January 2020, the defendant was charged in a fourth superseding indictment with several crimes, including conspiracy to commit mail and wire fraud and honest services mail and wire fraud (Count One) and conspiracy to commit federal programs bribery (Count Two).  Dkt. 732 at ¶¶ 13, 23, 26, 56–57, 65–66, 165–181, 279–281, 290–291, 369–372.

The indictment alleged that, in addition to the determination of which students to admit and the resulting composition of undergraduate classes, "admissions slots" themselves "are important assets of [USC and Georgetown]."  *Id.* ¶ 57; *see also United States v. Abdelaziz*, 68 F.4th 1, 12 (1st Cir. 2023) (noting that the indictment charged the defendants with, *inter alia*, conspiracy to commit property fraud "by depriving the universities of property in the form of 'admissions slots'").  Specifically as to Count One, the indictment alleged that the defendant conspired with others to commit mail fraud and wire fraud by depriving the universities of property in the form of admissions slots:  "that is having devised and intending to devise a scheme and artifice to defraud and to *obtain money and property*, to wit, . . . *admission to the Universities*, by means of

materially false and fraudulent pretenses, representations, and promises . . . ."   Dkt. 732 at ¶ 370(a)-(b) (emphasis added).

The defendant moved to dismiss Count One insofar as it charged her with conspiracy to commit mail and wire fraud.  *See generally* Dkt. 1042.  The premise of the defendant's motion was that admission slots are not property as a matter of law:  "[A]n 'admission slot' is not a traditional form of property cognizable under the mail and wire fraud statutes."  *Id.* at 7.  The defendant's 25-page motion did not reference the "right-to-control" theory.  Instead, the defendant described various characteristics of traditional forms of property and argued that admission slots did not fit the mold.  *See id.* at 8–11.  For example, she argued that "admission slots have no inherent economic value."  *Id.* at 9.  In opposition, the government advanced two independent arguments:  that admission slots are property; and, in addition, that the right-to-control theory recognized by the Second and Fourth Circuits also justified denying the defendant's motion to dismiss Count One.  *See* Dkt. 1170 at 25–35.

First, the government argued, at length, that college admission slots are a form of property cognizable under the mail and wire fraud statutes.  *See id.* at 25–29.  For example, the government argued that admission slots are "limited" in number and have "economic value"—both traditional hallmarks of property.  *Id.* at 28.  The government analogized admission slots to the "unissued degrees" that the Sixth Circuit concluded were property in *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997), a case that did not rely on the right-to-control theory because the Sixth Circuit had previously *rejected* that theory in *United States v. Murphy*, 836 F.2d 284, 251–53 (6th Cir. 1988) (rejecting mail fraud convictions based on right-to-control theory).  *See* Dkt. 1170 at 27–29.

Second, the government argued in the alternative that admission slots are *also* cognizable under the mail and wire fraud statutes under the right-to-control theory.  *Id.* at 30.  In advancing

this alternative argument, which was limited to two paragraphs in a ten-page section addressing the property fraud charges, the government noted: "The conclusion that the universities have a cognizable interest in their admissions slots *also* follows from the . . . principle that the property interests protected by the mail and wire fraud statutes include the interest of a victim in controlling his or her own assets."  *Id.* (emphasis added) (collecting cases in the Second and Fourth Circuits adopting the right-to-control theory).  It makes no sense that the government would argue that admissions slots are "also" cognizable under the right-to-control theory if that theory were the exclusive basis for the government's charge—and, of course, it was not.

In reply, the defendant again focused on Count One's principal theory that admission slots are themselves property, as alleged in the indictment and discussed in the government's opposition: "There is simply no plausible basis for suggesting that an 'admission slot' is a traditional form of property," she argued.  Dkt. 1228 at 3–7.  Separately, in a different section, the defendant contended—in just over one paragraph—that the alternative right-to-control theory did not save Count One: "The Government *also* argues that it alleged a property right based on the universities' 'right to control access to their valuable assets.'  But that vague right of control— standing alone—is not a cognizable property right for purposes of the fraud statutes."  *Id.* at 7 (emphasis added).  The defendant thus acknowledged that the government was "also" making a right-to-control argument as an alternative to its principal property argument.

In denying the defendant's motion to dismiss Count One, this Court rejected both of the defendant's property fraud arguments.  *See United States v. Sidoo*, 468 F. Supp. 3d 428, 439–42 (D. Mass. 2020).  Citing *Frost*—a case that, as noted, did not rely on the right-to-control theory— the Court noted that "an admissions slot is not, in this case, meaningfully distinct from an unissued degree."  *Id.* at 441.  The Court explained that admission slots have the characteristics of traditional

property interests, concluding that "the definition of 'property' extends readily to encompass admission slots" because, among other reasons, "admission slots at competitive universities, such as USC, are both limited and highly coveted." *Id.* at 441.  The Court further noted that admission entitles students "to a vast array of material university resources, from dormitories to laboratories." *Id*. at 442.  Citing *United States v. Barrington*, 648 F.3d 1178, 1191 & n.11 (11th Cir. 2011), an Eleventh Circuit case that similarly rested on a traditional property theory (and *not* a right-to-control theory), the Court found that universities also have an "intangible property interest in the integrity of their academic system," and that admitting unqualified students could inflict concrete financial harm by "decreas[ing] the value of [their] degrees" and impairing their ability "to attract qualified tuition-paying students" or "to solicit donations."  *Sidoo*, 468 F. Supp. 3d at 442.  In addition, relying on Second Circuit precedent, the Court affirmed the government's alternative right-to-control theory, finding that "[t]he ability to grant admission is an asset of the university subject to its control."  *Id.* at 441 (citing *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007)).

## 2.    <u>The Defendant's Plea Agreement, Guilty Plea, and Sentencing</u>

In the lead-up to her trial, the defendant again moved to dismiss the charges against her, this time under the Eighth Amendment, because, in her view, her arrest amounted to "cruel and unusual punishment," and she could not stand trial "without risking her life."  Dkt. 1878 at 19, 28. The Court denied her motion.  Dkt. 1927.

Approximately one month before her trial, the defendant's counsel approached the government seeking a plea agreement.  On August 11, 2021, the defendant and the government entered into a binding plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C).  Dkt. 2441. Pursuant to that agreement, the defendant agreed to plead guilty to Count One—insofar as the indictment alleged property fraud under the mail and wire fraud statutes (as opposed to the bribery

bases for Count One under the honest services fraud statute)—and the government agreed to dismiss the more serious federal programs bribery conspiracy charge in Count Two following the imposition of sentence. *Id.* at 1. The defendant's applicable Guidelines Sentencing Range on Count Two after trial would have been 78 to 97 months in prison. *See* U.S.S.G. §§ 2C1.1(a)(2), (b)(1), and (b)(2). The parties agreed to recommend a sentence of six weeks incarceration, an additional 12 months of home detention (followed by 12 additional months of supervised release), a fine of $250,000, and 500 hours of community service. Dkt. 2441 at 3.

In a separate numbered provision of her plea agreement titled "waiver of right to appeal and to bring future challenge," the defendant agreed to a waiver of her rights to appeal and/or collaterally attack her conviction and sentence: "Defendant agrees that she will not challenge her conviction [and sentence] on direct appeal or in any other proceeding, including a separate civil lawsuit." *Id.* at 3-4. The defendant's appeal waiver continued:

> Defendant understands that, by agreeing to the above, she is agreeing that her conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge her conviction and sentence regardless of whether she later changes her mind or finds new information that would have led her not to agree to give up these rights in the first place.

*Id.* at 4 (underlining in original). The only exceptions to the defendant's broad appeal waiver were (i) ineffective assistance of counsel, and (ii) serious misconduct by law enforcement. *Id.*

The defendant also agreed to a breach provision, which provided that if the defendant breached her plea agreement, the government would be released from the agreement and entitled to pursue any charges dismissed under it, and to use any of the defendant's statements (including her Rule 11 colloquy) against her in future proceedings. *Id.* at 5. The defendant further agreed that if she breached any term of her plea agreement, she waived any defenses based on the statute of limitations. *Id.* The defendant signed her plea agreement, including the following provision:

14

"I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest." *Id.* at 7.

Three weeks before her scheduled trial, the defendant appeared for her Rule 11 hearing. Dkt. 2115 (transcript). After being sworn, the defendant stated her understanding of the charge to which she was pleading guilty: "conspiracy to commit mail and wire fraud, but not bribery." *Id.* at 6. The government then outlined the terms of the parties' plea agreement, including that the defendant agreed to plead guilty to "conspiracy to commit mail and wire fraud to obtain property." *Id.* at 7. Further, the government specifically detailed the plea agreement's appeal and collateral waiver: "the defendant waives her right to appeal and she'll not be able to challenge her conviction or her sentence, either on direct appeal or in a collateral proceeding." *Id.* at 7–9. The defendant confirmed that the recitation of the plea agreement was accurate and that she understood its terms. *Id.* at 9.

After a further inquiry by the Court to ensure that the defendant's guilty plea was knowing and voluntary (*id.* at 9–12), the government stated the facts that would be proven at trial, with which the defendant agreed (*see id.* at 12–16). Pertinent here, the defendant agreed that she was guilty of both the traditional and alternative right-to-control species of property frauds: that "at Georgetown and USC, admission spots, the determination of which students to admit, ***and*** the resulting composition of undergraduate classes are assets of the university." *Id.* at 13 (emphasis added). The defendant confirmed that she did not disagree with or "have anything to add" to any of the facts recited by the government, and she pleaded guilty to Count One. *Id.* at 16–17. The defendant's counsel even interjected to ensure that the defendant was entering a plea only to the property fraud conspiracy charged in Count One, and not the honest services fraud (bribery) conspiracy—but said nothing about either the traditional or right-to-control theories of property

fraud.  *Id.*  After considering the parties' plea agreement and the colloquy as a whole, the Court

found as follows:

> [I]t is the finding of the Court in the case of *United States v. Eli[s]abeth Kimmel*
> that the defendant is fully competent and capable of entering an informed plea and
> that her plea of guilty is a knowing and voluntary plea, supported by independent
> basis in fact, containing each of the essential elements of the offense charged. Her
> plea is therefore accepted and she is now judged guilty of that offense.

*Id.* at 17–18.

At sentencing, the defendant represented to the Court that she "comes before this Court for

sentencing accepting responsibility, intensely remorseful for her conduct. . . [and] mortified at her

own involvement in this scandal and the harm it has caused."  Dkt. 2451 at 1.  The defendant filed

no substantive objections to her offense conduct facts set forth in the PSR.  *See* PSR at 57–58.[4]

The Court accepted the parties' plea agreement and imposed the agreed-upon sentence, following

which the government—pursuant to the plea agreement—dismissed Court Two of the indictment,

charging the defendant with conspiracy to commit federal programs bribery.  Judgment entered on

December 10, 2021.  Dkts. 2474, 2480.

More than two years later, on February 5, 2024, the defendant moved to vacate her

conviction under 28 U.S.C. § 2255.  Dkt. 2749.  More than two weeks later—after the Court

ordered the government to respond and a corresponding civil action was opened and assigned (*see*

24-cv-10297-NMG)—the defendant filed a motion for recusal of the assigned District Judge.  Dkt.

2755.

---

[4] The defendant's counsel submitted a PSR objection for "Informational Purposes Only,"
again reiterating that her plea was "to the charge in Count One of conspiracy to commit mail and
wire fraud," but that "[s]he did not plead guilty to conspiracy to commit honest services mail and
wire fraud or federal programs bribery."  PSR at 57.  Once again, the defendant said nothing
suggesting that her plea was limited to a particular theory of property fraud.

III.   **LEGAL STANDARD**

"Under 28 U.S.C. § 2255, a prisoner in custody 'claiming the right to be released' may file a motion to vacate, set aside, or correct a sentence." *Teixeira v. United States*, 2024 WL 185387, at *1 (D. Mass. Jan. 17, 2024) (Saylor, J.) (citing 28 U.S.C. § 2255(a)).  Relief is available only if the sentence "was (1) imposed in violation of the Constitution or the laws of the United States or by a court that lacked jurisdiction; (2) in excess of the maximum authorized by law; or (3) otherwise subject to collateral attack." *United States v. Acevedo*, 2019 WL 3003904, at *2 (D. Mass. July 9, 2019) (Gorton, J.) (citing *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998)).[5]

"The petitioner bears the burden of establishing the need for relief[.]" *Id.*  To be entitled to relief, "the petitioner must present 'exceptional circumstances' that make the need for redress 'evident.'" *Id.* (quoting *David*, 134 F.3d at 474).  "Postconviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness." *Dubose v. United States*, 2011 WL 4498993, at *4 (D. Mass. Sept. 23, 2011) (Saris, J.) (quoting *Singleton v. United States*, 26 F.3d 233, 236 (1st Cir. 1994)).

IV.   **ARGUMENT**

The defendant's § 2255 motion should be denied for four reasons.  First, because the defendant's guilty plea to conspiracy to commit mail and wire fraud rested on two independent theories of liability—a standard property theory and a right-to-control theory—the Supreme Court's decision in *Ciminelli v. United States*, which overturned the right-to-control theory, does not undermine her conviction.  *See* 598 U.S. 306, 308 (2023).  Second, the defendant's motion is in any event procedurally barred by her plea agreement, in which she expressly waived her right

---

[5] Unless otherwise noted, all internal quotation marks, citations, and alterations are omitted.

to appeal or collaterally attack her conviction.  <u>Third</u>, the defendant's motion is statutorily time-barred.  And <u>fourth</u>, the defendant has also procedurally defaulted her collateral arguments.

**A.**  ***Ciminelli* Has No Bearing on the Defendant's Conviction for Property Fraud**

The defendant's motion relies on the following syllogism: (1) her conviction for mail and wire fraud conspiracy was premised on the right-to-control theory; (2) the Supreme Court overturned that theory in *Ciminelli*; and (3) therefore, the defendant is entitled to relief because she pleaded guilty to an offense that "was not a crime." Dkt. 2749 at 6.  But this argument fails at its first step, because the defendant's conviction did *not* rely exclusively on the right-to-control theory—as the indictment, the defendant's own motion to dismiss, the Court's decision denying that motion, and the defendant's guilty plea allocution all make abundantly clear, and as the First Circuit's decision in *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023), confirms.

In *Ciminelli*, the Supreme Court addressed the wire fraud and conspiracy convictions of defendants who allegedly engaged in bid-rigging in an effort to win development contracts.  598 U.S. at 310–11.  The government had alleged that by secretly rigging the bidding to favor his company, Ciminelli had deprived the entity responsible for selecting the project developer of property in the form of its right to control "valuable economic information necessary to make discretionary economic decisions."  *Id.*  The Supreme Court rejected this right-to-control theory, holding that: "The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest.  Accordingly, the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 316.  As Justice Alito's concurrence made clear, however, the Court's decision had no bearing on wire fraud cases that did not rely on the right-to-control theory.  "The opinion of the Court correctly answers the sole question posed to us:  whether the right-to-control theory supports liability under the federal wire

18

fraud statute. . . . I do not understand the Court's opinion to address the fact-specific issues on remedy outside the question presented, including . . . the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts." *Id.* at 317–18 (Alito, J., concurring).

Unsurprisingly, courts applying *Ciminelli* have uniformly held that the decision has no impact on mail and wire fraud convictions where, as here, the defendant schemed to obtain property. *See, e.g.*, *United States v. Kousisis*, 82 F.4th 230, 240 & n.63 (3d Cir. 2023) (affirming wire fraud convictions, distinguishing *Ciminelli*, and noting that the property at issue was "the actual [property obtained] as a result of Appellants' fraudulent scheme"); *United States v. Porat*, 76 F.4th 213, 218–21 (3d Cir. 2023) (discussing *Ciminelli* and affirming wire fraud convictions of business school dean who engaged in scheme to falsely inflate school's rankings in U.S. News and World Report to obtain property); *United States v. Griffin*, 76 F.4th 724, 738 (7th Cir. 2023) (affirming wire fraud conspiracy conviction following *Ciminelli* where allegations that defendant schemed to obtain property was "explicit in the indictment"); *United States v. Shih*, 73 F.4th 1077, 1101 (9th Cir. 2023) (affirming property fraud convictions and distinguishing *Ciminelli*).  As one district court explained in rejecting a *Ciminelli*-based argument to overturn convictions for property fraud: "That was the extent of *Ciminelli*'s holding—the Court's rejection of the right-to-control theory.  Nothing more."  *United States v. Miller*, 2023 WL 7346276, at *3 (N.D. Cal. Nov. 6, 2023) (Breyer, J.).

The defendant's contention that "*Ciminelli* knocked the legs out from under [her] conviction," Dkt. 2749 at 11, is wrong, and the question isn't close.  As an initial matter, the defendant ignores the express confines of *Ciminelli* itself, which vacated convictions premised *exclusively* on the right-to-control theory.  The only reason the Supreme Court did not affirm on

an independent property-fraud basis is because it was not alleged in the indictment and the government did not pursue such a theory at any point in the prosecution. *See Ciminelli*, 598 U.S. at 310–11 (noting that the government relied exclusively on the right-to-control theory "[t]hroughout the grand jury proceedings, trial, and appeal."). Here, by contrast, the indictment specifically alleged that the defendant engaged in "a scheme and artifice to defraud and to obtain money and property, to wit, . . . *admission to the Universities*." Dkt. 732, ¶¶ 370(a)–(b) (emphasis added).

The nature of the allegations was not lost on the defendant. That is why she filed *more than 30 pages of briefing* arguing that admission slots are not traditional property, while devoting *less than one page*—in her reply brief, but not her opening brief—to the right-to-control theory. *Supra* at 11–12. She argued, for example, that an admission slot could not be property because it "is intangible, and there were relatively few well-recognized forms of intangible property at common law." Dkt. 1042 at 8. She also argued that, "[b]ecause admission slots have no inherent economic value to universities . . . the alleged scheme did not inflict 'pecuniary harm' on them for purposes of the Sentencing Guidelines. . . . and therefore a property interest was not at stake." *Id.* at 9. She even attempted to argue that "a university 'admission slot' is not property, but rather an offer to attend the university and receive educational services in exchange for tuition payments." *Id.* at 15.

In response, the government argued, flatly, that "[t]he 'property' described in the Indictment—admissions slots at the universities and SAT/ACT tests and the scores on those tests—qualifies as such under settled precedent." Dkt. 1170 at 25. It noted, among other things, that "[t]he number of admissions slots, like the number of degrees, is limited," that "admissions slots have 'economic value,'" and that the scheme imposed "real costs" on its victim universities,

20

such as "the prospect of a decline in applications and reduced donations in the future." *Id*. at 28. Indeed, the government argued, "[t]he phrase 'admissions slot' refers to a place in the admitted student body," and the indictment "establishes that the object of the conspiracy was to obtain these reserved positions—a commodity that, by its nature, is inherently limited." *Id*. at 32. The government's briefing made clear that the right-to-control theory was an independent and alternative theory of liability that "also" supported Count One. *Supra* at 11–12. And, as noted, the Court's decision likewise cited several of the government's arguments—including *both* the traditional property arguments *and* the alternative right-to-control arguments—in denying the defendant's motion.

The defendant's plea agreement further underscored that she was pleading guilty to Count One in its entirety (aside from the honest services fraud object of the charged conspiracy)—and not exclusively to either a traditional property fraud or right-to-control theory of mail or wire fraud conspiracy. *Supra* at 13–14. During her Rule 11 colloquy, the defendant similarly allocuted that she was pleading guilty to Count One "insofar as that count alleges conspiracy to commit mail and wire fraud *to obtain property*," *id.* at 15 (emphasis added), clarifying only that she was not pleading guilty to the bribery aspect of the charge, *id*.

In sum, the defendant (1) pleaded guilty to an indictment that specifically alleged that admission slots were "important assets" and "property" of the universities and charged her with conspiracy to commit property fraud, (2) challenged the government's theory of wire and mail fraud on the basis that admissions slots were not a "traditional form" of property, (3) lost that motion, and then (4) agreed during her plea hearing that she was pleading guilty to "fraud to obtain property," on the basis of facts that confirmed her guilt under *both* a traditional property fraud theory *and* an alternative right-to-control theory.

Finally, if there were any conceivable doubt about these facts—and there is none—the First Circuit's decision in *Abdelaziz* erases it.  In that appeal, the government *did not rely at all on the alternative right-to-control theory*, and focused exclusively on its principal theory: "The asserted 'property' that the government argues was obtained here is 'admissions slots.'" *Abdelaziz*, 68 F.4th at 33.[6]  If the premise of the defendant's motion were true—*i.e.*, that the indictment, this Court's denial of the defendant's motion to dismiss, and her conviction all rested exclusively on the right-to-control theory—then the First Circuit would necessarily have reversed the mail and wire fraud convictions in *Abdelaziz* in the absence of a right-to-control argument.  But the court did no such thing.  Instead, it "reject[ed] [defendants'] argument that their property-based convictions under these statutes must be reversed . . . because 'admissions slots' cannot be property." *Id.* at 34.  In so doing, the court explained that whether admissions slots are property in a given situation is a fact-intensive question depending on the circumstances, vacated the property fraud convictions solely on a jury-instruction issue, and explained, "We emphasize the narrowness of our holding: We do not hold that admissions slots cannot ever be property.  Nor do we hold that the jury instruction given by the district court could never be appropriate." *Id.*  Of course, this holding provides no recourse to Kimmel, who pleaded guilty to Count One.  To the contrary, the First Circuit's decision in *Abdelaziz* confirms the validity of the defendant's conviction on a traditional property fraud theory—which may be why the defendant's motion does not address the decision at all.  *See generally* Dkt. 2749.

---

[6] *See United States v. Abdelaziz*, 22-1129 (1st Cir. 2022), Brief of Appellee United States, at 84 n.33; *see also* Reply Brief of Defendant-Appellant John Wilson, 2022 WL 4935418, at *20 (1st Cir. 2022) ("[T]he Government abandons [the right-to-control theory].  The question on appeal is therefore whether [the defendant] sought to deprive the schools of *traditional* property.").

In short, *Ciminelli* does not undermine the defendant's conviction.  And because that case is the exclusive basis for her claim, her motion should be denied.

### B.  The Appeal and Collateral Attack Waiver that the Defendant Agreed to in Her Plea Agreement Forecloses Her Motion

Beyond its lack of substantive merit, the defendant's motion is procedurally barred by the appeal and collateral attack waiver in her plea agreement.  Indeed, the First Circuit and courts in this District have consistently enforced such appeal and collateral attack waivers in denying § 2255 motions without even considering their merits.  *See, e.g.*, *United States v. Ciampi*, 419 F.3d 20, 25–27 (1st Cir. 2005) (affirming denial of § 2255 motion based on collateral waiver in defendant's plea agreement where this Court adequately informed defendant of provision during Rule 11 hearing); *see also, e.g.*, *Sotirion v. United States*, 617 F.3d 27, 33–38 (1st Cir. 2010) (affirming denial of § 2255 motion and enforcing collateral waiver in plea agreement); *United States v. Craig*, 357 F. Supp. 3d 87, 88–90 (D. Mass. 2019) (Saris, J.) (same); *United States v. DeFronzo*, 281 F. Supp. 3d 243, 246–47 (D. Mass. 2017) (Gorton, J.) (same).

The First Circuit is not alone.  As the Second Circuit held just a few months ago:

> At bottom, a waiver of the right to bring a postconviction challenge is presumptively enforceable, even after the legal landscape shifts. A defendant who wishes to maintain his right to collaterally attack his conviction in the event of unforeseen legal developments may, of course, attempt to negotiate more favorable waiver terms with the government before pleading guilty. But where the waiver itself is clear, unambiguous, knowingly and voluntarily entered, and supported by consideration – here, the government's agreement not to pursue charges or arguments that could have resulted in a much higher sentence – the terms of the plea agreements must be enforced.

*Cook v. United States*, 84 F.4th 118, 125 (2d Cir. 2023); *see also, e.g.*, *Portis v. United States*, 33 F.4th 331, 335–36 (6th Cir. 2022) ("The principle that future changes in law do not vitiate collateral-challenge waivers is mainstream. . . . All circuits to our knowledge follow this principle[.]").

This Court has held that a plea agreement provision waiving a defendant's right to bring a collateral attack under § 2255 is "presumptively valid" under the standard set forth by the First Circuit in *United States v. Teeter*, 257 F.3d 14 (1st Cir. 2001), if three conditions are satisfied: "(1) the plea agreement clearly outlined the waiver, (2) the Court inquired as to the defendant's understanding of the right(s) he or she was waiving, and (3) enforcement of the waiver would not constitute a miscarriage of justice." *DeFronzo*, 281 F. Supp. 3d at 246 (citing *Teeter*, 257 F.3d at 25–26).

The first two *Teeter* conditions are easily satisfied here, and the defendant's motion—which spends barely one page on the waiver—does not contend otherwise. Dkt. 2749 at 16. <u>First</u>, the defendant's plea agreement clearly outlined the appeal and collateral attack waiver in a standalone section, using language essentially identical to that which the First Circuit and courts in this District have affirmed multiple times. *Compare supra* at 14, *with Craig*, 357 F. Supp. 3d at 88 (finding similar language in plea agreement "plainly bars all future challenges"), *and Ciampi*, 419 F.3d at 22 (enforcing provision that waived "any right to appeal or collaterally challenge either the conviction or the sentence").[7] <u>Second</u>, during her Rule 11 colloquy, the government explicitly noted the appeal waiver in the defendant's plea agreement and stated that it covered collateral challenges, and the defendant affirmed, in response to the Court's inquiry, that "those were the terms of [the] plea agreement with the government" as she understood them. Dkt. 2115 at 9–11. The defendant also responded, "I do" when asked if she understood she had "no right to appeal." *Id*. Based on the colloquy, the Court then found that the defendant—a Harvard-educated lawyer,

---

[7] The only two exceptions to the appeal and collateral attack waiver in the defendant's plea agreement are for situations involving ineffective assistance of trial counsel or serious government misconduct. The defendant (represented by the same counsel who has represented her throughout these proceedings) does not pursue either of those avenues of relief, and they are accordingly both waived.

married to a former prosecutor, and represented by sophisticated counsel—was freely and voluntarily pleading guilty pursuant to her plea agreement. *Id.* at 9–12, 17. That is more than enough. *See, e.g.*, *Ciampi*, 419 F.3d at 20 (finding second condition satisfied where "the government recited in open court all the terms of the plea agreement, including the waiver of appellate and habeas rights").

Accordingly, the defendant's argument depends entirely on the demanding third *Teeter* factor: her motion can overcome the waiver of collateral challenges only if its enforcement would cause a "miscarriage of justice." As the First Circuit and this Court have held, "[t]his miscarriage of justice exception is meant only for 'egregious cases' and is to be applied 'sparingly and without undue generosity,'" and it "requires a strong showing of innocence, unfairness, or the like." *Sotirion*, 617 F.3d at 36; *see also DeFronzo*, 281 F. Supp. 3d at 246.

The defendant's motion does not come close to meeting this demanding burden. The evidence of the defendant's fraud and bribery, which led the defendant to seek a plea agreement less than one month before trial, was overwhelming. *Supra* at Part II.A. The defendant's motion does not even attempt to point to facts supporting a "showing of innocence" on the property fraud (or dismissed bribery) charges, other than assailing the alternative right-to-control theory. *See* Dkt. 2749 at 16–17 (contending that the defendant was "convicted for an act . . . that the law does not make criminal"). And the argument that the defendant was convicted exclusively on a theory "that the law does not make criminal" is simply not true for the reasons discussed above. *Supra* at Part IV.A.

Moreover, one of the most important factors that First Circuit courts consider in determining whether enforcing a waiver of collateral challenges amounts to a "miscarriage of justice" is whether the plea agreement conferred benefits on the defendant. For example, in

*Sotirion*, the First Circuit explained that "far from working a miscarriage of justice, Sotirion's plea agreement conferred significant benefits on him."  617 F.3d at 38 (discussing dismissal of charges as part of plea agreement).  And the First Circuit has held, in enforcing a waiver of collateral challenges, that a defendant "would have been naïve indeed to suppose that he could have his cake (*viz.*, significantly reduced jail time) and eat it too (*viz.*, an appeal)."  *Ciampi*, 419 F.3d at 26–27 (finding collateral attack waiver "far from create[ed] a miscarriage of justice" where plea agreement provided for dismissal of charges and allowed defendant to "escape the perils" of a trial).  As this Court has explained in enforcing a waiver of collateral challenges, a defendant "cannot accept the benefit of that agreement and then repudiate it when a change in circumstances later arises."  *DeFronzo*, 281 F. Supp. 3d at 247.  Likewise, Judge Saris found in *Craig* that the defendant could not meet the "high burden" to establish a miscarriage of justice because he "received a substantial benefit in his plea agreement in exchange for his appellate waiver" in the form of dismissal of more serious charges and a sentencing recommendation below his Guidelines Sentencing Range on the dismissed charges.  *See* 357 F. Supp. 3d at 89–90.

Here, enforcing the plea agreement's appeal and collateral attack waiver would not remotely approach a miscarriage of justice.  A graduate of Harvard Law School with a net worth of hundreds of millions of dollars who was represented by sophisticated counsel, the defendant voluntarily sought and entered into the plea agreement, and in so doing obtained considerable benefits.  For example, the defendant obtained dismissal of the more serious federal programs bribery conspiracy charge and avoided a trial, after which she would have faced a Guidelines Sentencing Range of between 78 and 97 months.  And while her plea agreement provided for a six-week term of incarceration, she obtained—upon thoughtful consideration by the government of her asserted medical issues—a benefit in the form of a substantial period of home confinement

in lieu of additional incarceration. Other defendants in this case—including defendants who insisted on and negotiated plea agreements that *preserved* certain appellate rights—received longer sentences for significantly less culpable conduct. *See, e.g.*, *United States v. McGlashan*, 19-cr-10080-NMG, Dkt. 1716 (plea agreement providing for three-month sentence where defendant paid $50,000 to engage in one instance of test-cheating, but retained certain appellate rights);[8] *United States v. Amy, Gregory Colburn*, 19-cr-10080-NMG, Dkt. 2459 (plea agreement providing for two-month sentence where defendants paid $25,000 to engage in one instance of test-cheating, but retained certain appellate rights).

The defendant's motion does not even attempt to distinguish *Ciampi*, *Sotirion*, *DeFronzo*, *Craig*, or any other case in this Circuit where courts have enforced collateral attack waivers. Nor does it advance a claim that the defendant is factually innocent of the property fraud and bribery charges. Instead, her motion confusingly cites an unpublished decision from the Seventh Circuit (Dkt. 2749 at 16), in which the defendant was sentenced to 25 years in prison and the court dismissed his appeal on the grounds that his appeal waiver was enforceable (after his counsel moved to withdraw because the appeal was frivolous). *See United States v. Vazquez Gatica*, 2023 WL 7017084, at *1–2 (7th Cir. Oct. 25, 2023) (unpublished order). And the only other in-Circuit precedent cited in the defendant's motion on this issue are cases in which the First Circuit enforced appeal waivers (on direct appeal), *see United States v. Lara-Joglar*, 400 F. App'x 565 (1st Cir. 2010), and affirmed the denial of a defendant's motion to withdraw a guilty plea (but declined to rule on the enforceability of the waiver in his plea agreement where there was evidence the

---

[8] Indeed, the First Circuit even enforced the appellate waiver in rejecting McGlashan's arguments that fell outside the scope of the issues he bargained to preserve. *See United States v. McGlashan*, 78 F.4th 1, 9–10 (1st Cir. 2023).

defendant was abusing prescription medications at the time of his plea agreement and Rule 11 hearing), *see United States v. Santiago Miranda*, 654 F.3d 130 (1st Cir. 2011).

In sum, the circumstances here easily satisfy each of the three *Teeter* conditions for enforcing the collateral attack waiver in the defendant's plea agreement, which bestowed significant benefits upon her.  Her motion raises no legitimate claim of actual innocence, and the entire premise of her argument—that she was convicted based exclusively on the now-overturned right-to-control theory—is wrong.  These circumstances do not remotely approach a miscarriage of justice, and the Court should therefore enforce the waiver and deny the defendant's motion.

### C.    The One-Year Statute of Limitations Bars the Defendant's Motion

Section 2255 provides that all motions filed beyond the one-year statute of limitations are time-barred, and that the one-year period runs from, as pertinent here, the latest of (1) the date on which the judgment of conviction becomes final, or (2) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized and made retroactively applicable to cases on collateral review.  *See* 28 U.S.C. § 2255(f)(1), (3).  As the First Circuit and this Court have explained, "Congress intentionally made the time limit for habeas claims strict to 'expedite collateral attacks by placing stringent time restrictions on them.'"  *Smoak v. United States*, 12 F. Supp. 3d 254, 261 (D. Mass. 2014) (Gorton, J.) (quoting *Ciampi*, 419 F.3d at 23).

The defendant's judgment became final more than two years ago.  *See* Dkt. 2480.  Accordingly, to the extent her § 2255 motion attempts to attack her conviction on any basis other than the Supreme Court's decision in *Ciminelli*, her arguments are time-barred by more than one year.  *See Smoak*, 12 F. Supp. 3d at 261 ("[S]ome of the bases on which the petitioner seeks relief are barred by the statute of limitations.").

28

To the extent the defendant's motion relies on *Ciminelli*—and even assuming that decision conferred substantive rights retroactive to cases on collateral review—the motion should be denied for the reasons set forth above: *Ciminelli*'s over-turning of the right-to-control theory does not undermine the defendant's conviction for scheming to obtain property in the form of admission slots. *Supra* at Part IV.A. Defendants cannot evade the one-year statute of limitations by premising § 2255 motions on cases that do not disturb their convictions. *Cf. Dimott v. United States*, 881 F.3d 232, 236–38 (1st Cir. 2018) (rejecting petitioners' attempts to "create an end run around AEDPA's statute of limitations" by "bootstrapping" untimely claims with a Supreme Court decision within the past year that did not affect conviction).

### D.   The Defendant's Motion Cannot Overcome Her Procedural Default

The defendant's motion fails for the additional reason that she has procedurally defaulted her claim by failing to pursue it on direct appeal. "Section 2255 is not a substitute for direct appeal." *Thongseng v. United States*, 2009 WL 3678678, at *2 (D. Mass. Oct. 28, 2009) (Saylor, J.). "[C]ollateral relief in a § 2255 proceeding is generally unavailable if a petitioner has procedurally defaulted h[er] claim by failing to raise it at trial or on direct appeal." *United States v. Hand*, 2023 WL 8283722, at *3 (D. Mass. Nov. 30, 2023) (Saylor, J.) (citing *Berthoff v. United States*, 308 F.3d 124, 127–28 (1st Cir. 2002)).

When a defendant fails to raise an argument on direct appeal, she can overcome procedural default only if she can show "(1) 'cause' excusing h[er] procedural default, and (2) 'actual prejudice' resulting from the errors of which [s]he complains, or if [s]he can show actual innocence." *Id.* (citing *United States v. Frady*, 456 U.S. 152, 168 (1982)); *accord United States v. Acevedo*, 2019 WL 3003904, at *2 (D. Mass. July 9, 2019) (Gorton, J.).

Here, even assuming *Ciminelli* affected her conviction on Count One—which it does *not*—the defendant procedurally defaulted on the claim by failing to raise it on direct appeal. The defendant could have declined to enter into a plea agreement absent a carve-out to challenge the right-to-control theory on appeal (as several of her co-defendants did in insisting on plea agreements that preserved their right to challenge particular legal theories), or she could have simply filed an appeal that challenged the right-to-control theory and the enforceability of her appeal waiver. She did not. Instead, she chose to skip that step and simply file a collateral attack several years later. The law is clear that, having made that choice, the defendant has procedurally defaulted on the arguments presented in her motion, and she must demonstrate cause and prejudice, or actual innocence. *See, e.g.*, *Portway v. United States*, 105 F. Supp. 3d 127, 129 (D. Mass. 2015) (holding that a § 2255 petition can be both procedurally defaulted and barred by a collateral waiver in a plea agreement, and that an appeal waiver does not constitute "cause" to overcome procedural default). The defendant cannot do either.

The defendant cannot establish cause for failing to raise the claim on direct appeal. As the First Circuit has explained, "in order to constitute cause for a procedural default, a claim must be 'so novel that its legal basis is not reasonably available to counsel.'" *Damon v. United States*, 732 F.3d 1, 5 (1st Cir. 2013) (citing *Reed v. Ross*, 468 U.S. 1, 16 (1984)). But even "futility" is not "novelty" sufficient to show cause: "Futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." *Id.* (concluding that defendant had not established cause even where his claim was expressly repudiated by binding First Circuit precedent at the time).

Here, it is difficult to imagine a more meager showing of cause. The defendant's argument challenging the right-to-control theory was hardly "so novel that its legal basis [was] not

30

reasonably available to counsel" on appeal; indeed, the defendant *made the exact argument* in her reply brief in support of her motion to dismiss Count One. *Supra* at 12. She then chose to abandon it, plead guilty, and not pursue an appeal—despite the fact that there was a circuit split at the time on the viability of the right-to-control theory. That is hornbook failure to establish cause, and certainly less justifiable cause than demonstrated by petitions that the First Circuit and courts in this District have denied. *See, e.g.*, *Damon*, 732 F.3d at 4–5; *United States v. McForbes*, 480 F. Supp. 3d 300, 302 (D. Mass. 2020) (finding no cause where "litigants, after all, had been raising the issue" later raised by petitioner on collateral attack "despite the existence of adverse circuit precedence"). And because the defendant has not demonstrated cause for her procedural default, the Court need not address prejudice. *See, e.g.*, *Derman v. United States*, 298 F.3d 34, 45 (1st Cir. 2002) (explaining that courts need not reach cause or prejudice if the defendant has not established the other).

Nor can the defendant establish actual innocence. "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Damon*, 732 F.3d at 5. Claims of "actual innocence" may be shown only in the "extraordinary case." *Ferguson v. United States*, 2018 WL 443444, at *4 (D. Mass. Jan. 16, 2018) (Saylor, J.). "To establish actual innocence, [a] petitioner must demonstrate that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him," and "in cases where the government has forgone more serious charges in the course of plea bargaining, [a] petitioner's showing of actual innocence must also extend to those charges." *Bousley v. United States*, 523 U.S. 614, 623–24 (1998). The defendant does not, because she cannot, purport to argue that she is actually innocent of conspiracy to commit federal programs bribery—the charge that the government dismissed as part of the plea agreement. The evidence of the defendant's fraudulent and corrupt intent on both

the fraud and bribery charges is overwhelming, and regardless of the viability of the right-to-control theory, her conviction for scheming to fraudulently obtain property in the form of admission slots for her children as athletic recruits in sports they did not play, in exchange for money, remains sound.

### E.   The Defendant's Motion for Recusal Is Meritless

As the above discussion makes clear, the defendant's § 2255 motion relies on distorting the indictment, the procedural history, the briefing and the Court's subsequent rulings on her motion to dismiss, and her Rule 11 colloquy, among other issues—all of which this Court is in the best position to consider, as it has for the past five years since the defendant was charged.  So, more than two weeks after the defendant filed her § 2255 motion, she moved to recuse the assigned District Judge from considering it.  Dkt. 2755.  The defendant's two-and-a-half-page recusal motion is frivolous, and it betrays the forum-shopping the defendant apparently believes is necessary for her § 2255 motion to withstand any scrutiny.

### 1.   Applicable Law

Recusal is governed by 28 U.S.C. § 455.  Under Section 455(a) and First Circuit precedent, recusal is not appropriate unless there is a "reasonable question, in any informed person's mind, as to the impartiality" of this Court.  *In re United States*, 441 F.3d 44, 68 (1st Cir. 2006) (citing 28 U.S.C. § 455(a)).  As the First Circuit has held, a judge "has a duty ***not*** to recuse himself or herself if there is no objective basis for recusal."  *Id.* at 67 (emphasis added).  And it has also emphasized that recusal motions are heavily disfavored because courts have "no wish to encourage strategic moves by a disgruntled party to remove a judge whose rulings the party dislikes":

> The disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially

> manipulating the system for strategic reasons, perhaps to obtain a judge more to
> their liking.

*Id.* (emphasis in original).

Litigants bear a heavy burden to demonstrate that recusal is necessary and must show significantly more than dissatisfaction with a judge's rulings, even those that are later determined to be incorrect.  In fact, "judicial rulings alone almost never constitute [a] valid basis for a bias or partiality recusal motion," and "[a]lmost invariably, they are proper grounds for appeal, not for recusal."  *United States v. Chan*, 2022 WL 952186, at *1 (D. Mass. Mar. 30, 2022) (Talwani, J.) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).  A district court has wide discretion in determining whether recusal is warranted so long as the decision is a "rational conclusion supported by a reasonable reading of the record."  *In re United States*, 666 F.2d 690, 695 (1st Cir. 1981).

Unsurprisingly, § 2255 petitions by dissatisfied defendants are often accompanied by motions to recuse the presiding District Judge, with asserted grounds ranging from disagreement with legal rulings and factual findings to allegations of personal bias.  Invariably, courts in this District deny those recusal motions and rule on the petitions.  *See, e.g.*, *United States v. Chan*, 2022 WL 17722544, at *1 (D. Mass. Dec. 15, 2022) (Talwani, J.) (denying recusal and § 2255 petition: "[C]ourts must not grant recusal simply to avoid any allegation of prejudice, since doing so would provide litigants with a veto against unwanted judges."); *United States v. Scott*, 450 F. Supp. 3d 82, 85 (D. Mass. 2020) (Gorton, J.) (denying motion for recusal in § 2255 proceeding "offer[ing] a litany of grievances ranging from prior adverse rulings to this Court's rejection of his plea agreement").

The First Circuit has found similar recusal motions "specious."  *Clemente v. United States*, 42 F.3d 1384, at \*4 (1st Cir. 1994) (unpublished).  Indeed, courts in this District have explained that recusal is particularly disfavored in § 2255 proceedings:

> The expectation that a judge may appropriately review his own [ ] conduct is ***especially strong*** in petitions pursuant to 28 U.S.C. § 2255.  All § 2255 motions are initially forwarded "to the judge who conducted the trial and imposed sentence . . ." Rule 4(a), Rules Governing Section 2255 Proceedings. As explained in the Advisory Committee Notes relating to this Rule's adoption in 1976, "***it is highly desirable in such cases that the motions be passed on by the judge who is familiar with the facts and circumstances . . . and is consequently not likely to be misled by false allegations as to what occurred*** . . . .  This Rule reflects the "long-standing majority practice[.]" 1976 Adoption Notes.  Based on this clear congressional mandate, judges routinely review Section 2255 motions relating to their prior rulings . . . .

*United States v. Stonier*, 2011 WL 666265, at \*2 (D. Mass. Feb. 14, 2011) (emphasis added); *see also Baldyga v. United States*, 337 F. Supp. 2d 264, 270 (D. Mass. 2004) (Gorton, J.) (denying § 2255 petition and recusal motion, and explaining that as the presiding session, the Court was particularly equipped to assess the defendant's attempts to take rulings "out of context" to "construct" a basis for recusal); *cf. United States v. Iacaboni*, 52 F. Supp. 3d 365, 368 (D. Mass. 2014) (Gorton, J.) (denying § 2255 petition and recusal motion, and explaining that as the presiding session, the Court had a "valuable perspective" to assess issues like prejudice).  Indeed, where collateral attacks are inadvertently filed before a different session, they are reassigned to the judge who issued the judgment.  *See, e.g.*, *Murray v. United States*, 2011 WL 1478949, at \*1 (D. Mass. Mar. 15, 2011) (Woodlock, J.) (reassigning § 2255 petition filed on MBD docket to presiding session that imposed sentence: "More fundamentally, as a matter of case assignment practice in this Court, a case such as this should be transferred to a sitting judge of this court who entered a judgment collaterally attacked.").

### 2.   The Defendant's Recusal Motion Should Be Denied

As the above precedent makes clear, the defendant's motion faces a mountain to climb to warrant recusal.  Accordingly, one would expect her to point to an array of support for the extraordinary relief she requests.  Instead, her abbreviated motion does not cite a single case—anywhere, ever—in which a court addressing a § 2255 petition granted a recusal motion, much less a similar case where, as here, the attack rests on an asserted change in the law after the defendant's guilty plea.  The defendant's motion advances only three arguments as to why recusal is necessary.  But none of them remotely warrants reassigning this case, and indeed, the arguments themselves are largely based on sleight-of-hand or even outright misstatements about its factual and procedural history, which this Court is in the best position to consider.

First, the defendant contends that recusal is necessary under 28 U.S.C. § 455(a).  Dkt. 2755 at 1–2.  But her motion does not attempt to point to any reason satisfying the demanding standard under that statute to show there is a "reasonable question, in any informed person's mind, as to the impartiality" of this Court.  *In re United States*, 441 F.3d at 68.  This Court already found in *Wilson*—in deciding to reassign that case under a Local Rule that has no bearing here—that "further proceedings certainly could be administered in a fair and unbiased manner."  Dkt. 2689 at 1–2.  That conclusion alone ends the Section 455(a) inquiry, as does the defendant's failure to allege any objective facts even questioning the impartiality of this Court.

Second, the defendant points to the Court's recusal on remand in *Wilson*, and contends that "the same grounds for recusal and reassignment apply to [her] post-conviction proceedings."  Dkt. 2755 at 1.  In support of that argument, the defendant contends that she "joined" unspecified motions "which elicited rulings from this Court" that were "overturned or questioned by the Court of Appeals," and that "those rulings concerned the ***very issues*** raised by [her] pending motion."

*Id.* at 2 (emphasis added).  The defendant adds that her § 2255 motion "stems from an incorrect ruling of law by this Court as to the property requirement of wire fraud," and that "ruling so infected her decision to plead guilty and the process of her plea itself."  *Id.* at 3.  These contentions are false, full stop.

The "very issue[]"—indeed, the only issue—raised by the defendant's § 2255 motion is that *Ciminelli* overturned the government's right-to-control theory of property fraud.  But that issue was not addressed by the First Circuit in *Abdelaziz*, because the government did not rely on it.  *Supra* at 22.  Far from justifying recusal, the First Circuit's decision underscores why the defendant's conviction remains sound: it did not rely on the right-to-control theory.[9]

The only basis for the Court's recusal in *Wilson* was a Local Rule that has no relevance here.  Upon remand (first for a new trial, and later, re-sentencing), Wilson moved for recusal under Local Rule 40.1(k), which governs "proceedings after appeal."  *See* Dkt. 2684; *see also* D. Mass. L.R. 40.1(k) ("When an appellate court remands a case to this court for a new trial…[and] [i]n all other cases in which the mandate of the appellate court requires further proceedings in this court…").  The Court recused itself under Local Rule 40.1(k)(2), which provides that "in all other cases in which the mandate of the appellate court requires further proceedings in this court, such proceedings shall ***not*** be conducted before the district judge . . . unless the judge determines that there will result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge."  *See* D. Mass. L.R. 40.1(k)(2) (emphasis added).  But of course, Local Rule 40.1(k)(2) does not apply here,

---

[9] Moreover, to the extent that the defendant also argued, in her motion to dismiss, that admission slots are not property as a matter of law, *supra* at 22, the First Circuit also *rejected* that argument, and instead vacated and remanded two defendants' property fraud convictions on a jury instruction issue, *supra* at 22.

where the defendant did not appeal, there was no "mandate of the appellate court," and the defendant's conviction was neither vacated nor remanded.  Indeed, Local Rule 40.1(k)'s presumption of reassignment on remand is the *opposite* of the well-established preference in this District and others for collateral proceedings to be decided by the session that presided over the underlying guilty plea or trial and imposed the sentence.  Moreover, while this Court, in applying Local Rule 40.1(k) and reassigning *Wilson*, referenced the "publicity associated with its trial and appeal," those concerns do not apply here because, of course, *there was no trial or appeal*, and the Court is not applying a Local Rule with a presumption in favor of reassignment.  Dkt. 2689 at 2.

Put simply, a defendant who pleaded guilty and admitted facts that establish her guilt under a legal theory that remains undisturbed cannot point to a conviction of a different defendant that was vacated (not reversed) on a jury instruction issue as a basis for recusal.  That argument borders on the absurd, and of course, this Court did not *sub silentio* recuse itself from considering motions filed by the 17 other parent defendants in this matter who pleaded guilty, were guilty, and remain guilty simply because it reassigned for re-sentencing the case of one defendant who went to trial and had some of his convictions vacated on appeal.

<u>Third</u>, the defendant contends that the "public attention" on this case "warrants reassignment."  Dkt. 2755 at 2.  In so arguing, she relies on a single case, *United States v. Mavroules*, selectively quoting it for the proposition that "in cases involving an 'unusual amount of publicity,' judges in this District have reassigned cases 'in the interest of justice.'"  Dkt. 2755 at 2 (citing *Mavroules*, 798 F. Supp. 61, 62–63 (D. Mass. 1992)).

What the defendant fails to mention about *Mavroules* is that Judge Tauro recused himself (at the outset of the case, over the defendant's objection) because of numerous relationships with the parties, attorneys, and witnesses, including: (1) a three-decade "excellent" and "very friendly"

37

relationship with the defendant's counsel, that included dining at each other's homes and counsel attending the Judge's wedding; (2) a "close" ten-year relationship with the lead Assistant United States Attorney, who had served as a law clerk for the Judge; (3) having had business dealings and co-invested in the ownership of a hotel with two witnesses named in the indictment; and (4) the Judge's multiple "contacts" with the defendant, whose congressional district included the Judge's home town. *See id.* at 61–62, 64 & App'x A. The court limited its reasoning to the "extraordinary coincidences that produced the unique totality of circumstances here." *Id.* at 63.

But even setting aside the defendant's misplaced reliance on *Mavroules*—her motion's only authority—"public attention" standing alone is not a sufficient basis to justify recusal in this, or any, case. In cases that received at least as much attention as the defendant's case, courts have denied recusal motions. *See generally, e.g.*, *United States v. Sampson*, 148 F. Supp. 3d 75, 82 (D. Mass. 2015) (denying recusal in death penalty re-sentencing where Judge moderated panel with defense expert witness, noting that denial of the motion "implicates the interest of not encouraging a reasonable public perception that parties can succeed in using § 455(a) to engage in strategic judge-shopping");[10] *see also United States v. Martorano*, 620 F.2d 912, 919–20 (1st Cir. 1980) (affirming denial of motion for recusal). Neither Section 455(a) nor First Circuit precedent suggest that defendants whose crimes attract public attention are somehow more entitled to recusal of the randomly assigned judge than defendants whose crimes attract none.

*     *     *

As the same law firm representing the defendant here wrote in opposing recusal in *Mavroules* (her motion's own authority): "[T]he appearance of judge-shopping where there is no

---

[10] Comparatively, a search of Google for "Gary Lee Sampson trial" produces more than one million results. A search of Google for "Elisabeth Kimmel college admissions" produces less than half that number.

basis for recusal is itself antithetical to the interests of justice[.]"  *Mavroules*, 798 F. Supp. at 68.
The striking lack of factual or legal support for the defendant's recusal arguments betrays her
motion's strategic motivation, and granting recusal would do far more harm to the interests of
justice than this Court's impartial consideration of her § 2255 petition.  *See, e.g.*, *Chan*, 2022 WL
17722544, at *1 ("[C]ourts must not grant recusal simply to avoid any allegation of prejudice,
since doing so would provide litigants with a veto against unwanted judges.").

## V.      CONCLUSION

For the foregoing reasons, the defendant's motion to vacate her conviction and sentence
(Dkt. 2749), and her motion for recusal (Dkt. 2755) should be denied, and her corresponding civil
petition should be dismissed without a hearing.[11]  *See Kimmel v. United States*, 24-cv-10297-
NMG, Dkt. 1.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: */s/ Ian J. Stearns*
STEPHEN E. FRANK
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
IAN J. STEARNS
Assistant United States Attorneys

---

[11] The defendant did not request an evidentiary hearing, and her motion is silent as to any
basis for such a hearing; instead, she requests "oral argument."  Dkt. 2749 at 18.  In any event, as
this Court has explained, a hearing on a § 2255 motion is "unnecessary" when it is "inadequate on
its face," meaning that the allegations, "if accepted as true, entitle the movant to no relief."  *Fenton
v. United States*, 914 F. Supp. 2d 79, 83 (D. Mass. 2012) (Gorton, J.) (quoting *United States v.
McGill*, 11 F.3d 223, 226 (1st Cir. 1993)) (denying request for hearing on § 2255 motion).  Indeed,
hearings on such motions "are the exception, not the norm," and defendants bear a "heavy burden"
to demonstrate that one is warranted.  *Id.* (quoting *Moreno-Morales v. United States*, 334 F.3d 140,
145 (1st Cir. 2003)).  The defendant has not even attempted to meet that heavy burden here.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<u>*/s/ Ian J. Stearns*</u>
IAN J. STEARNS
Assistant United States Attorney